**F I L E D**

PUBLISH

**October 6, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,
      Cross-Appellant,

 v.

MATIAS SERRATA, JR., WILLIAM
FULLER; KENDALL LIPSCOMB,

      Defendants-
      Appellants/Cross-Appellees.

Nos. 03-2011, 03-2012, 03-2019,
03-2036

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-01-593-WPJ)**

Mario Esparza, Las Cruces, New Mexico for Appellant/Cross-Appellee Serrata.

Roy R. Barrera, Sr. (Sharon S. Brown, with him on the briefs), Nicholas and Barrera,
P.C., San Antonio, Texas for Appellant/Cross-Appellee Fuller.

James F. Maus, El Paso, Texas for Appellant/Cross-Appellee Lipscomb.

Bradley J. Schlozman, Deputy Assistant Attorney General (David Iglesias, United States
Attorney, R. Alexander Acosta, Assistant Attorney General, Mark L. Gross, Attorney,
Clay G. Guthridge, Attorney, and Lisa J. Stark, Attorney, with him on the briefs),
Department of Justice, Washington, D.C., for Appellee/Cross-Appellant United States of
America.

Before **EBEL**, **HENRY**, and **HARTZ**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

These cases concern the related appeals of three former correctional officers, William Fuller, Mathias Serrata, and Kendall Lipscomb, charged with criminal offenses arising out the assault of an inmate at the Lea County Correctional Facility in Hobbs, New Mexico. We exercise jurisdiction pursuant to 18 U.S.C. § 1291. We affirm each of the convictions but vacate the downward departures with respect to each defendant. We also hold that the defendants have established that the district court plainly erred when sentencing these defendants, in light of the Supreme Court's holding in *United States v. Booker*, 125 S. Ct. 738 (2005), and we therefore vacate each of their sentences and remand for resentencing consistent with this opinion and *Booker*.

## I. BACKGROUND

### A. Factual Background

These three consolidated appeals, which we have consolidated for disposition, stem from an incident that occurred at the Lea County Correctional Facility (the "Facility") on December 21, 1998, involving the three defendants. Lieutenants William B. Fuller and Matias Serrata, Jr. relocated from the Texas

criminal justice system and had been working at the Facility for approximately three weeks at the time of the incident. Kendall Lipscomb was a correctional officer who only had approximately six months of experience at the time of the incident.

The incident began when inmate Eric Duran refused to sit in his assigned seat in the dining hall at lunchtime. After engaging in a verbal altercation with a correctional officer and resisting several direct orders, Mr. Duran was ordered to leave the dining hall, forfeit his meal, and return to his cell. Instead, Mr. Duran exited the dining hall, immediately returned through an adjacent door, and got in line for a second lunch tray. Correctional officers Gary Butler and Lipscomb then forcibly escorted Mr. Duran from the dining hall into the corridor, where they were joined by Lieutenants Fuller and Serrata.

On Mr. Fuller's instruction, the officers then took Mr. Duran to an isolated hallway known as "hallway P-15" to minimize the risk of a riot in the dining hall. Fuller Br. at 6. Once in the hallway, Mr. Fuller instructed Mr. Lipscomb to utilize the Facility's video camera, but the camera either malfunctioned during the incident or was never turned on, so there is no tape of the event. Mr. Fuller then ordered Mr. Duran to place his hands on the wall, and he complied. At this point, the government's version of the facts and the defendants' version of the facts diverge.

According to the government, Mr. Duran, and several of the eyewitnesses who testified at trial, Mr. Fuller threatened Mr. Duran, "put a fist in his face, and said, 'we're all going to fuck him up,'" as several officers and two dogs entered the hallway. Aple's Br. at 4. Mr. Duran allowed his left wrist to be cuffed but then, convinced that he was about to be beaten, said that he would not allow his other hand to be cuffed until the video camera was turned on. *Id.* at 5. After a sergeant in the hallway stepped forward and explained to Mr. Duran that if he submitted to handcuffing he would not be harmed, Mr. Duran removed his right hand from the wall to allow Mr. Fuller to cuff it. As his hand came off the wall, Mr. Fuller allegedly threw Mr. Duran to the ground, breaking one of his teeth. After Mr. Duran was lying on the ground face first with both hands behind his back, Mr. Fuller "'stomped' on Duran's forehead," with his boots, and Mr. Butler and Mr. Fuller, who were standing on opposite sides of Mr. Duran, proceeded to alternate kicking Mr. Duran in the head. Each officer allegedly kicked Mr. Duran in the head four or five times. *Id.* at 6. During the assault, which lasted 40-45 seconds, Mr. Serrata "stood within arm's reach, watched, but did not say or do anything to stop the assault." *Id.*

The defendants' version of the story is considerably different. According to Mr. Fuller, Mr. Duran's repeated resistance incited the other inmates in the dining hall to create a disturbance, which included verbal insults and thrown objects.

-4-

Once in the hallway, he told Mr. Duran to "cuff up," and brought in the dogs to intimidate Mr. Duran into complying with the order. Fuller Br. at 6. Mr. Duran resisted and struggled prior to being taken down to the floor. Officers Fuller and Butler were on either side of Mr. Duran, and repeatedly yelled for him to "cuff up." *Id.* at 6. Officer Fuller ordered a "K-9" dog unit to further intimidate Mr. Duran. Mr. Duran continued to defy the officers' orders when the dogs were brought out. After allowing one handcuff to be placed on his wrist, Mr. Duran, without permission, pulled the other arm away and turned to face the officers. Mr. Duran was, under this version of the facts, fighting with the officers to an extent that use of force on the part of the officers was reasonable and necessary.

Mr. Lipscomb acknowledges that when he arrived with the video camera, he handed the camera to someone else, and assisted in subduing Mr. Duran by striking him in the midsection with a closed fist and engaging the prisoner with a pain compliance technique consisting of twisting the inmate's ankle and knee.

After the incident occurred, Mr. Duran was examined by a physician, who observed that he was groggy, had abrasions on his head, neck, back, ear and eye, and had a black boot scuff mark on the right side of his head. Shortly thereafter, Mr. Duran lost consciousness and was taken to a hospital by ambulance. He was released shortly thereafter. Ultimately, Mr. Duran did not have any permanent

physical injuries or physical impairment as a result of the use of force.

After the assault, Mr. Fuller apparently became concerned about coming up with an explanation for his use of force. He ordered Mr. Butler to punch himself in the face in an effort to orchestrate a false charge that Mr. Duran had assaulted Mr. Butler. Mr. Butler and Mr. Fuller then drove to the Hobbs Police Department and filed assault charges against Mr. Duran. The Hobbs Police Department filed criminal assault charges against Mr. Duran, which were later dismissed.

Mr. Fuller also met with the other officers who witnessed the event and instructed them to file false statements saying that Mr. Fuller was not present during the incident and justifying the use of force against Mr. Duran (i.e., saying that Mr. Duran fought with and resisted the officers, that he punched Mr. Butler in the face, etc.). The warden ordered the officers to re-write their reports, stating that he knew that Officer Fuller was present in the hallway. The officers rewrote nearly the same reports, except to add that Officer Fuller entered the hallway at the end of the assault and placed his foot on Mr. Duran's head to control him. According to Mr. Fuller, he "had second thoughts about covering-up his participation, and tearfully told Warden Bravo that he lied in his report the next morning." Fuller Br. at 10. According to the government, while he did admit to having been present at the event, he did not tell the Warden about the other aspects of the report that were false.

-6-

Two weeks later, the New Mexico State Police launched a criminal investigation into the attack on Mr. Duran. The defendants repeated their false statements to the police and provided the police with false documents. Eventually, the FBI joined the investigation. Several of the correctional officers who witnessed the event were accused of lying to federal investigators by sticking to their original false reports, but inexplicably, they were not charged with a crime. Over two years after the incident, a grand jury indicted Mr. Fuller, Mr. Serrata, Mr. Lipscomb, and Mr. Butler on charges of conspiracy to violate Mr. Duran's civil rights, conspiracy to obstruct justice, and witness tampering. Mr. Butler pleaded guilty to two counts and testified against his co-defendants at trial. At the end of a ten-day trial, a jury convicted the other three defendants on all counts.

## B. Procedural History

The counts are summarized as follows:

**Count 1** – Charges Mr. Fuller with willfully using excessive force against Mr. Duran in violation of 18 U.S.C. § 242.

**Count 2** – Charges Mr. Serrata with failing to intervene to stop the assault on Mr. Duran in violation of 18 U.S.C. § 242.

**Count 3** – Charges Mr. Fuller with conspiring to violate Mr. Duran's due process rights by filing false charges against him in violation of 18 U.S.C. § 241.

**Count 4** – Charges each of the defendants with conspiring to obstruct justice by making false statements in violation of 18 U.S.C. § 371.

**Count 5** – Charges each of the defendants with obstructing justice by

witness tampering in violation of 18 U.S.C. § 1512(b)(3). The relevant statute, 18 U.S.C. § 1512(b)(3), prohibits "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempt[ing] to do so, or engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings."

At the beginning of the sentencing hearing, the district court made some preliminary comments, expressing its reservation with the mandatory sentences it would impose:

> This is one case where I believe that these sentencing guidelines impose an unduly harsh result on the defendants. . . .
>
> If I had discretion . . . I would [structure] a sentence where there was a minimal amount of jail time and a significant amount of probation time. . . .
> The other thing I want to state is that I am well aware that Defendants Lipscomb and Serrata, in terms of the force that was applied to the inmate, that was justifiable. . . . [T]hey get tagged with some of the . . . "relevant conduct." And while, again, I don't agree with it and I don't think it's fair, these guidelines are mandatory, and I'm bound to follow them.

Rec. vol. XIX, at 74-75.

The court determined that the defendants subjected Mr. Duran to an aggravated assault, defined as a felonious assault involving a dangerous weapon (i.e. Mr. Fuller's uniform boots) with intent to do bodily harm. When sentencing the defendants individually, the district court judge again expressed concern about

-8-

his constriction by the guidelines as to each of them.

## Mr. Serrata

As to Mr. Serrata, the district court noted "if I had the discretion that I wish I had, I would probate most, if not all, of the sentence. And so my hands are tied." *Id.* at 66. The district court increased Mr. Serrata's sentence from the base level of 15, adding four levels for Mr. Fuller's use of a dangerous weapon (his boots). two levels for the infliction of bodily injury, six levels for acting under the color of law, two levels for the physical restraint of the victim, and two levels for the obstruction of justice, resulting in an offense level of 29, criminal history category I. The district court found mitigating circumstances in Mr. Serrata's family circumstances, employment history and civic duties, and under § 5K2.0 applied a five-level downward departure. The total offense level was thus 24, with a criminal history category I, and a sentencing range of 51 to 63 months. The district court sentenced Mr. Serrata to 51 months on each count, to be served concurrently. Mr. Serrata also objected to the characterization of Mr. Fuller's boots as a dangerous weapon, which resulted in a four-level adjustment to his offense level.

## Mr. Lipscomb

When it sentenced Mr. Lipscomb, the district court judge stated "because I came from state court in New Mexico, if this were a case in state court, I think,

certainly, probation would be warranted. But these guidelines do not give me that flexibility." *Id.* at 59-60. The court adopted the pre-sentence report's (PSR) recommendation that there should be a four-level increase for "bodily injury" pursuant to 2A2.2(b)(3)(A); a six-level increase for "under color of law," pursuant to § 2H1.1(b)(1)(B); and a two-level increase for a physically restrained victim, pursuant to § 3A1.3.

Mr. Lipscomb objected to the offense level based upon "aggravated assault," and increases in the offense level based upon "the use of dangerous weapon," and "physically restrained victim." The district court reduced the offense level by two levels because of Mr. Lipscomb's "minor role" in the offense, and the court granted Mr. Lipscomb's motion for a downward departure and departed five levels for a final offense level of 16, category II, with a sentencing range of 24-30 months. The court sentenced Mr. Lipscomb to 24 months of imprisonment. On appeal, Mr. Lipscomb again raises these challenges.

Mr. Fuller

As to Mr. Fuller, the district court judge noted that "[i]f I were in state court, I think a substantial – maybe be all of the sentence would be probated, but I don't have that kind of discretion." *Id.* vol. XIX, at 78. After applying a four-level increase for the use of a dangerous weapon (his boots), the district court applied a two-level increase for the specific offense characteristic for bodily

injury under USSG § 2A2.2(b)(3)(A). The district court applied a six-level increase because the offense was committed under color of law, under USSG § 2H1.1(b)(1)(B).

Next, the court imposed a two-level increase for restraint of the victim under USSG § 3A1.3, and a two-level increase for an aggravating role as an organizer, leader, manager, or supervisor of criminal activity under USSG § 3B1.1(C). Finally, the court imposed a two-level increase for obstruction of justice under USSG § 3C1.1 for a total offense level of 33, criminal history category I.

Mr. Fuller objected to the PSR, arguing that the court erred when it used the aggravated assault guideline, and also challenging the district court's assessment of his boots as a dangerous weapon under § 2A2.2. Mr. Fuller reasserted these challenges at the sentencing hearing.

The court granted Mr. Fuller's motion for a downward departure under USSG § 5K2.0, citing Mr. Fuller's family circumstances, employment history, civic duties, lack of criminal record, and other mitigating circumstances. The application of the downward departure resulted in a total offense level of 28, criminal history category I, resulting in a guideline range of 78 to 97 months. The court imposed a sentence of 78 months of imprisonment (58 months for counts I, III, and V to run concurrently and 20 months for Count IV to run consecutively).

**C. Issues before us on appeal**

The defendants now appeal their convictions and sentences. On appeal, the defendants raise several challenges, some of which overlap. Mr. Serrata argues that 1) there is insufficient evidence to support his conviction; 2) the district court erred in applying a four-level enhancement based on its conclusion that Mr. Fuller's work boots were dangerous weapons, and 3) the district court plainly erred when it found facts by a preponderance of the evidence that resulted in a four-level increase in his sentence, violating his Sixth Amendment rights under *Blakely/Booker*.

Mr. Lipscomb argues that 1) there is insufficient evidence to support his conviction; 2) the district court erred in instructing the jury regarding the intent requirement of 18 U.S.C. § 1512(b)(3); 3) the court erred in refusing to give an accomplice instruction regarding the testimony of one of the government's witnesses; 4) the district court improperly excluded evidence of Mr. Duran's prior bad acts; and 5) the district court's findings of fact by a preponderance of the evidence constituted a violation of his Sixth Amendment rights under *Blakely/Booker* and amount to plain error.

Mr. Fuller argues that 1) the court improperly excluded evidence of Mr. Duran's prior bad acts; 2) the court improperly applied the aggravated assault

-12-

guideline instead of the minor assault guideline; 3) the court erred in considering his work boots to be a dangerous weapon and applying a four-level weapon enhancement; and 4) the court committed constitutional plain error when it increased his sentenced in violation of *Blakely/Booker*.

The government cross-appeals, having objected below, and again arguing that the district court erred in granting a five-level downward departure to each defendant.

We affirm each of the defendant's convictions, and we hold that the district court did not err when it applied the aggravated assault guidelines. We agree with the government that the district court's abused its discretion when it granted each defendant a five-level downward departure. Finally, we agree with the defendants that their sentencing amounts to plain error in the wake of *Blakely/Booker*. We thus vacate each of their sentences and remand to the district court for resentencing.

## II. DISCUSSION

First, we address Mr. Serrata's trial error argument as to sufficiency of the evidence. Second, we will consider Mr. Lipscomb's alleged trial errors, regarding sufficiency of the evidence and inadequate jury instructions. Third, we will assess the evidentiary arguments raised by both Mr. Lipscomb and Mr. Fuller, which are identical. Fourth, we shall address the sentencing errors alleged by Mr. Serrata

-13-

and Mr. Fuller, which are identical to those raised by Mr. Lipscomb. We will then proceed to the government's cross-appeal, in which the government challenges the five-level downward departure granted to each defendant. Finally, we will examine the *Blakely/Booker* challenges raised by each defendant.

**A. Mr. Serrata's Sufficiency of the Evidence Challenge**

In addition to his conviction for witness tampering and conspiracy, defendant Serrata was convicted of deprivation of rights under color of law, pursuant to 18 U.S.C. § 242, based on his failure to intervene to protect Mr. Duran during the assault. Section 242 of Title 18 provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 242.

1. Standard of review

"We review de novo whether the prosecution presented sufficient evidence to support a conviction." *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002). "In conducting this review . . . we ask whether, taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). We will not re-weigh the evidence or assess the credibility of witnesses. *Id.* Under this standard, "[w]e will not reverse a conviction . . . unless no rational trier of fact could have reached the disputed verdict." *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (citations and quotations omitted). If we conclude the evidence presented was insufficient to sustain a conviction, retrial is prohibited. *Id.*

2. Analysis

Mr. Serrata argues that there was insufficient evidence to sustain his conviction for failure to intervene. He bases this argument on his lack of involvement with the assault and the inconsistency of the witness testimony,

noting that "there was some confusion evident in the testimony about precisely what happened," Serrata's Br. at 26, and that "[n]o one seems to be completely certain of [Mr. Serrata's role] because the testimony about his conduct is contradictory and varies from witness to witness." *Id.* at 30. Mr. Serrata seems to be arguing that he did not know that Mr. Duran was being kicked and that "[i]f he did not know, then he could not have acted willfully in his failure to protect Eric Duran." *Id.* at 29. He acknowledges that the government's witnesses testified that they saw Mr. Duran being kicked, but notes that "[i]t is just as reasonable to believe Mr. Serrata's testimony as it is to believe the others'." *Id.* at 31.

The government counters Mr. Serrata's argument by responding that "[o]verwhelming and consistent testimony established that Serrata witnessed an unjustified assault, had the opportunity and ability to intervene, and failed to do so." Aple's Br. at 16. Four eyewitnesses testified that Mr. Serrata was in a position to intervene yet simply watched the attack and did nothing to stop it. The government further argues that "[e]ven if he were correct . . . in characterizing the evidence as inconsistent, his argument would fail because the resolution of any and all factual inconsistencies rests within the sole province of the jury." *Id.* (citing *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001).

Mr. Serrata contends that his inaction, coupled with the varying testimony with regard to his role in the offense, is enough to call into question the jury's

verdict. Mr. Duran has a constitutional right to be free from cruel and unusual punishment, and, as a prison guard, Mr. Serrata has a concomitant constitutional duty to protect him from such harm. *Hudson v. McMillian*, 503 U.S. 1, 5, 12 (1992) (reinstating conviction against prison guard who "expressly condoned the use of force") (internal quotation marks omitted); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (explaining that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety. . . . [An] affirmative duty to protect arises ... from the limitation which [the State] has imposed on his freedom to act on his own behalf.").

There is no question that Mr. Serrata had a legal obligation to act to prevent the assault on Mr. Duran, and we flatly reject any suggestion otherwise. *See United States v. Reese*, 2 F.3d 870, 887-88 (9th Cir. 1993) (affirming conviction of an officer who did not intervene and holding that "[t]here was a co-extensive duty on the part of the United States to protect against lawless violence persons so within their custody, control, protection and peace; and a corresponding right of those persons, secured by the Constitution and laws of the United States, to be so protected by the United States"); *accord Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (noting, in the context of a 42 U.S.C. § 1983 suit, clearly established precedent that a law enforcement official who fails to intervene to

prevent another law enforcement official's use of excessive force may be liable).

As to the inconsistent testimony, the record reveals that four eyewitnesses testified that as Mr. Duran was lying defenseless on the floor with his hands cuffed behind his back Mr. Serrata stood within arm's reach and watched the attack. *See* Trial tr. vol. IX, at 27 (testim. of Officer Cary Escobedo stating Mr. Serrata was "facing the kick[ing] . . . looking right at it" and took no action; *id.* 125-26 (testim. of Officer Gary Butler stating Mr. Serrata was "within arm[']s reach of Lieutenant Fuller, "looking right at [me]," and "just st[oo]d there."); *id.* vol. XII, at 577 (testim. of Officer Heather Surratt stating Mr. Serrata was "four feet" from Mr. Duran looking "[a]t the [kicking] incident that was happening"); *id.* at 602, 604-05 (similar testimony of Officer Robert Kersey, Jr.).

Despite potential inconsistencies, the jury obviously chose to credit the evidence of the government's eyewitnesses and to discredit the evidence in Mr. Serrata's favor–a choice the jury was free to make. This is not a case in which we can conclude that "no jury, when presented with the evidence introduced at trial together with the reasonable inferences therefrom, could find the defendant guilty beyond a reasonable doubt." *United States v. Kimler*, 335 F.3d 1132, 1140 (10th Cir. 2003). Accordingly, we reject Mr. Serrata's sufficiency of the evidence claim.

**B. Mr. Lipscomb's Challenges to Count 5 based on Sufficiency of the Evidence and Inadequate Jury Instructions**

1. Sufficiency of the Evidence

Mr. Lipscomb argues that the evidence was insufficient to support his conspiracy and witness tampering convictions under 18 U.S.C. § 1512(b)(3). Again, our standard of review is de novo, with the limitations described above. *Kimler*, 335 F.3d at 1140.

Mr. Lipscomb's argument hinges on this issue of intent. He observes that a conviction under 18 U.S.C. § 1512(b)(3) requires an intent to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense," Lipscomb Br. at 15 (quoting 18 U.S.C. § 1512(b)(3)). He contends that his intent behind putting false information in his report and presenting false information to the New Mexico police was "to prevent retaliation against himself by the prison management," not to hinder or delay a federal investigation. *Id.* at 16. In support of this contention, Mr. Lipscomb argues that he did not know or believe that the information he provided would be transmitted to federal authorities; therefore, it could not have been his intent to prevent the communication of truthful information to federal law enforcement officers.

Mr. Lipscomb relies heavily on a case that he refers to as *United States v.*

*Hardy and Davis*, 185 F.3d 407 (5th Cir. 1999) [hereinafter *United States v. Causey*, as it is correctly referred to in the government's brief]. The defendant in *Causey* was convicted of murder with an intent to "prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense," a violation of 18 U.S.C. § 1512(a)(1)(C), which has an intent requirement analogous to that of 18 U.S.C. § 1512(b)(3). The Fifth Circuit reversed the conviction. The court reasoned that because the defendant only complained to the local police department, his "specific intent was to short-circuit the [local police] investigation," and "no evidence [suggested] that the likelihood or possibility that the murder might impact a future federal investigation played a part in th[e] crime." *Causey*, 185 F.3d at 422-23.

Other circuits have adopted a somewhat less demanding approach to proving intent under § 1512. In *United States v. Veal*, 153 F.3d 1233, 1251-52 (11th Cir. 1998), the Eleventh Circuit held that "all that was required [to establish a] . . . violation of § 1512(b)(3) was the *possibility* or *likelihood* that [the defendants'] false and misleading information would be transferred to federal authorities irrespective of the governmental authority represented by the initial investigators." Section 1512(b)(3)'s language "suggests that Congress intended . . . not merely to safeguard the integrity of ongoing or imminent federal

-20-

investigations, but *more broadly to facilitate federal law enforcement's ability to gather information* about possible federal crimes—including federal crimes that are not yet under investigation at the time of the offense." *United States v. Bailey,* 405 F.3d 102, 108 (1st Cir. 2005) (emphasis added).

We agree with these cases that imminence of a federal investigation is of little or no consequence. *See id.*; *see also United States v. Guadalupe*, 402 F.3d 409, 411 (3d Cir. 2005) ("[P]roving a violation of 18 U.S.C. § 1512(b)(3) *does not depend on the existence or imminency* of a federal investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime by officials who happen to be federal.") (emphasis added); *United States v. Perry*, 335 F.3d 316, 321 (4th Cir. 2003) (requiring proof of intent to mislead the local police in order to "'influence an investigation that *happened to* be federal'") (emphasis added) (adopting and quoting *United States v. Applewhaite*, 195 F.3d 679, 687 (3d Cir. 1999)); *United States v. Baldyga*, 233 F.3d 674, 680(1st Cir. 2000) (holding that § 1512 "require[s] only a *possibility* that the conduct will interfere with communication to a federal agent") (emphasis added); *United States v. Diaz*, 176 F.3d 52, 90-91 (2d Cir. 1999) (noting that the statute "does not require that the government prove a defendant's 'state of mind' with respect to the federal character of the law enforcement officer"); *United States v. Emery*, 186 F.3d 921, 925 (8th Cir. 199) (*rejecting* defendant's

-21-

contention that § 1512 "requires proof that he knew that a federal investigation was under way, or knew that his crime was a federal one that raised the possibility of a federal investigation"). We therefore reject Mr. Lipscomb's argument that the government needed to prove that he believed the information would be transmitted to federal authorities.

### 2. Jury Instructions

Defendant Lipscomb makes two arguments concerning the manner in which the district court instructed the jury. First, he argues that the jury instructions regarding the intent requirement under 18 U.S.C. § 1512(b)(3) were in error. This argument is closely related to the argument addressed in Section II.B.1. Second, he argues that the court should have instructed the jury that government witness Robert Kersey was an accomplice.

"We review for abuse of discretion a district court's refusal to give a particular instruction. In doing so, we also consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *Bangert Bros. Const. Co., Inc. v. Kiewit Western Co.*, 310 F.3d 1278, 1287 (10th Cir. 2002) (internal citations and quotation marks omitted). However, if a party does not object to the language of a jury instruction before the district court, "our review is limited to determining whether its use constituted plain error." *United States v. Cavely*, 318 F.3d 987, 999 (10th Cir. 2003).

### a. Instructions Regarding the Intent Requirement Under 18 U.S.C. § 1512(b)(3)

Mr. Lipscomb argues that the instructions given to the jury suggested that "all that is necessary to infer proof of [the intent] element is that the predicate offense is federal in nature, without anything else." Lipscomb Br. at 20. He contends that this instruction is in conflict with the *Causey* case discussed above. Mr. Lipscomb did not challenge this instruction below, and we therefore review the instruction for plain error.

We decline to hold that the district court committed plain error when instructing the jury regarding what it must find to satisfy the intent requirement of § 1512(b)(3). As the government points out, Mr. Lipscomb has "lift[ed] two sentences of the court's lengthy instruction out of context, read them back-to-back even though they do not appear together, and interpret[ed] them 'separate and apart' from the remaining charges." Aple's Br. at 39. The instruction in question explains that "the government must prove that the defense in question was actually a federal offense and that the defendant believed that the witness – toward whom the defendant engaged in misleading conduct – might communicate with federal authorities." *See* Rec. vol. I, doc. 145, Jury Instr. 8D.[1] This instruction clearly

---

[1] In its entirety, Instruction 8D provides:
The third and fourth elements of 18 U.S.C. [§] 1512(b)(3) may be proven by evidence establishing that the defendant acted with the purpose of causing

(continued...)

another person to delay or refrain from communicating with federal law enforcement officers or a federal judge about a possible federal crime, either permanently or for a period of time. Thus, if a defendant provided false information to another person, intending that that person would rely on the false information and thus not communicate with a federal law enforcement officer about a possible federal crime, you may find that the third and fourth elements have been satisfied.

No state of mind need be proved with respect to the circumstance that the law enforcement officer is an officer or employees of the Federal Government or that the judge is a judge of the United States. The government does not have to show that the information actually was or would have been communicated to federal authorities. However, the government must prove that the offense in question was actually a federal offense and that the defendant believed that the witness – toward whom the defendant engaged in misleading conduct – might communicate with federal authorities. The fourth element may be inferred from the fact that the offense was federal in nature. The government need not establish that the defendants specifically intended to interfere with a federal investigation. All that the statute requires is that the government establish that the defendants had the intent to interfere with an investigation that was in fact federal.

In determining whether a defendant knowingly engaged in misleading conduct with the intent to keep information about the assault on Eric Duran from federal law enforcement officers, you may consider a variety of facts. These include: (1) any statement made or heard by a defendant regarding the use of force on Duran an d attempts to conceal or justify it; (2) any action taken or not taken by a defendant in connection with the assault and attempts to conceal or justify it; (3) the nature of the underlying offense; (4) any training a defendant received regarding permissible uses of force; (5) the training a defendant received regarding use of force reports; (6) the training a defendant received regarding whether incidents of excessive force are investigate by federal officers or pursued in federal court; (7) a defendant's experience with and knowledge of federal investigations into assaults on prisoners; (8) any other circumstances you deem relevant and reliable.

I instruct you that a use of excessive force which violates 18 U.S.C. § 242 is a violation of federal law within the meaning of 18 U.S.C. § 1512.

I further instruct you as a matter of law that investigators from the Federal Bureau of Investigation are federal law enforcement officers a[s] that term is use

(continued...)

-24-

satisfies the intent requirement for § 1512(b)(3) as interpreted by a majority of our sister circuits. Moreover, it is not "plain or obvious" that the instruction is improper even under the more exacting *Causey* standard. *See United States v. Gonzalez Edeza*, 359 F.3d 1246, 1250 (10th Cir. 2004) (noting that in order to constitute plain error, an "error must (1) be an actual error that was forfeited . . .; (2) be plain or obvious . . .; (3) affect substantial rights; and (4) seriously affect the fairness, integrity, or public reputation of judicial proceedings") (internal omissions omitted).

### b. Refusal to Give an Accomplice Instruction

Mr. Lipscomb also argues that the district court erred when it refused his request to instruct the jury that witness Robert Kersey was an accomplice because he admitted to lying to prison authorities and to the New Mexico State Police out of "loyalty and stupidity." Lipscomb Br. at 21. Though Officer Kersey was not charged in the case, he operated under the belief that he could have been indicted and was told by prosecutors and the FBI that he could be charged. *Id.* Consequently, defendants Lipscomb and Fuller requested an accomplice instruction for Officer Kersey stating that "the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from

---

[1](...continued)
in 18 U.S.C. § 1512.

punishment . . . must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." Defendants Fuller's and Lipscomb's Requested Instr. No. M (attached to Lipscomb Br.). The court refused to give an accomplice instruction for Officer Kersey, but a similar instruction was given regarding witness Officer Gary Butler's testimony. *See* Rec. vol. I, doc. 145, Jury Instr. 20.[2]

Accomplice instructions are required when a defendant is tied to a crime solely through the uncorroborated testimony of an accomplice-witness. "If the testimony of an accomplice is uncorroborated, the court must instruct the jury that

---

[2] Instruction 20, in its entirety, reads as follows:

> In this case the government called as one of its witnesses an alleged accomplice, named as a co-defendant in the indictment, with whom the government has entered into a plea agreement providing for the dismissal of some charges and the possibility of a lesser sentence than the co-defendant would otherwise be exposed to for the offense to which the co-defendant plead[ed] guilty. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.
>
> An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence, in and of itself, of the guilt of any other person.

testimony of accomplices must be carefully scrutinized, weighed with great care, and received with caution. Failure to so instruct the jury is 'reversible error.'. . . Accomplice testimony is uncorroborated when the testimony is the only testimony directly tying the defendant into the criminal transaction." *United States v. Gardner*, 244 F.3d 784, 789 (10th Cir. 2001) (internal citations, alterations, and quotations marks omitted). Mr. Lipscomb argues that Officer Kersey's testimony was uncorroborated because

> he is the only witness who placed [Mr. Lipscomb] in the P-15 hallway holding a video camera before the use of force on Duran began. He is also the only witness that stated [Mr. Lipscomb] actively participated in creating the alleged false statement directed by Co-Appellant Fuller in the conference room after the Duran incident.

Lipscomb Br. at 23.

Our decision in *United States v. Wiktor*, 146 F.3d 815 (10th Cir. 1998), is instructive as to the level of corroboration that our law requires. In *Wiktor*, the defendant was convicted of maliciously damaging property for setting fire to his company's storage room in an attempt to commit insurance fraud. An employee and accomplice testified at trial

> that defendant had told him he had set the fire and glued the sprinkler head. . . . [,] that defendant instructed him to exaggerate the losses insurance documents, . . . . [and that defendant made] statements that the fire was very opportune, that he would make a lot of money out of it, and that they had to make it look like the business would reopen.

*Id.* at 816-17. Despite the fact that the accomplice's testimony seems to have been

-27-

the most specific and the most damaging, we held that this testimony was

"substantially corroborated," *id.* at 18, because

> [t]hrough other witnesses, there was evidence that defendant was present in the building when the force was estimated to have begun; that his presence at that time was unusual; that he had a strong financial motive to commit arson; and that the sprinkler head was indeed 'super-glued' shut.

*Id.* at 818.

Similarly, Officer Kersey's testimony was *substantially corroborated* in this case. Like the accomplice in *Witkor*, Officer Kersey's testimony may have included some details that were not included in the other testimony, but Officer Kersey's testimony was not the only testimony tying Mr. Lipscomb to the crime. Moreover, the court did generally instruct the jury to "consider whether 'a witness [has] a personal interest in the outcome of the case.'" Aple's Br. at 45 (quoting Instr. 17); *see also Wiktor*, 146 F.3d at 818 (giving some weight to the fact that "the district court's credibility instructions to the jury included as a factor to be considered 'the witness' interest in the result of a trial'"). The district court did not abuse its discretion when it refused to give the proffered instruction.

### C. Mr. Lipscomb's and Mr. Fuller's Challenges to the District Court's Evidentiary Rulings

1. Whether the District Court Properly Excluded Evidence of Mr. Duran's Other Bad Acts Under Rules 401, 403 and 404(b)

Mr. Lipscomb's next argument overlaps with Mr. Fuller's, and we shall

address them together.[3]   They challenge the district court's denial of their requests to introduce evidence regarding Mr. Duran's previous resisting arrest and refusing to be handcuffed.  They argue that the trial court erred in excluding evidence of Mr. Duran's other bad acts.  They contend that Mr. Duran's conduct during past juvenile and adult arrests demonstrates that he "had a pattern of physically resisting being handcuffed and had intended to provoke a use of force and take-down in this instance," Fuller Br. at 15, and that the evidence of Mr. Duran's refusal to be handcuffed in the past was therefore admissible under FED. R. EVID. 404(b).

Specifically, they argue: 1) that the trial court should have permitted the defense to cross-examine Mr. Duran regarding his conduct during an adult arrest for aggravated assault on a police officer, 2) that the court should have allowed extrinsic evidence of Mr. Duran's refusal to be handcuffed during a juvenile arrest, in the form of testimony from the arresting officer, Officer Smith, and 3) that evidence of Mr. Duran's refusal to be handcuffed several times in the past should have been admitted as "habit evidence" pursuant to Rule 406.

"The district court has broad discretion in determining the admissibility of evidence.  We review the trial court's evidentiary rulings for abuse of discretion.

---

[3] Mr. Lipscomb adopts Mr. Fuller brief regarding this issue, in accord with FED. R. APP. 28(I).

Under this standard, we will not disturb a trial court's decision unless we have a definite and firm conviction that the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Talamante*, 981 F.2d 1153, 1155 (10th Cir. 1992) (internal citations, quotations marks, and alterations omitted).

a. Cross-examination Regarding Duran's Second Adult Arrest

Mr. Duran has two adult felony convictions on his record. According to Mr. Lipscomb and Mr. Fuller, Mr. Duran refused to be handcuffed during both adult arrests. The district court allowed the defense to cross-examine Mr. Duran regarding his conduct during his first adult arrest (for aggravated burglary, forgery, and resisting arrest) but did not allow the defense to cross-examine Mr. Duran regarding his second adult arrest (for aggravated assault of a police officer).

As to the prior conviction for aggravated burglary, forgery, and resisting arrest, the cross-examination of Mr. Duran proceeded as follows:

Q: When they came to arrest you for aggravated burglary, you refused
    to be handcuffed, didn't you?

A: Yes ma'am.

Q: Okay. And you had a scuffle with the officers?

A: Yes, ma'am.

Q: And they had to take you down, right?

A: Yes, ma'am.

Q: And they took you down hard to the ground, didn't they?

A: Yes, ma'am.

Q: And at that time, you suffered some injury to your mouth?

A: Yes, ma'am.

Q: But that wasn't the first time that you resisted arrest, was it?

A: No, ma'am.

Q: In fact, when you were a juvenile, you resisted arrest as well, didn't you?

A: Yes, ma'am.

. . . .

Q You do remember resisting arrest when you were a juvenile, correct, at some point?

A: Yes, ma'am.

Q: And during that resistance you refused to be handcuffed, right?

A: Uh-huh, Actually I just fled.

. . . .

Q: Do you recall that time in May when the officers tried to find you?

A: No. I don't remember.

. . . .

Q: And then what happened was, you were driving around in a car, and you got arrested and convicted of another felony offense, right?

A: Yes, ma'am.

Q: And that was for aggravated assault on a police officer, right?

A: Yes, ma'am.

Q: Because when the police officer tried to arrest you for –

Govt counsel: Objection [based on additional questions about the underlying facts].

The court sustained the government's objection.

Mr. Lipscomb and Mr. Fuller argue that the court's rulings were inconsistent – both of Mr. Duran's adult felonies involved similar resisting arrest conduct by Mr. Duran. Thus, there is no logical reason to preclude detailed questioning about his resistance during his arrest for the aggravated assault on a police office. According to the two defendants, the testimony was relevant under Rule 404(b) to establish Mr. Duran's pattern of refusing to be handcuffed without a take-down.

The government contends that the district court actually permitted the defendants to introduce far more evidence of Mr. Duran's criminal history than the rules of evidence actually allow. According to the government, the only testimony

that the district court excluded was offered for an impermissible purpose.

Rule 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is *not admissible to prove the character of a person in order to show action in conformity therewith.* It may, however, be admissible for other purposes, such as proof of motive, opportunity, *intent,* preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b) (emphasis supplied).

We have adopted a four-part test for determining the admissibility of evidence under Rule 404(b). *United States v. Youts*, 229 F.3d 1312, 1319 (10th Cir. 2000) (citing *Huddleston v. United States,* 485 U.S. 681 (1988)). In order to be admissible, 1 & 2) "the evidence must be offered for, and relevant to, a proper purpose"; 3) the trial court must make a Rule 403 determination as to whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and 4) the trial court "must instruct the jury that the evidence of similar acts is to be considered only for the limited purpose for which it was admitted." *Id.*

According to the government, the defendants attempted to admit the evidence in question for the impermissible purposes. *See* Aple's Br. at 27 (arguing that "the court repeatedly allowed the defense to use [] criminal history evidence, in violation of Rule 404(b), for the impermissible purpose of implying

-33-

that the victim had a propensity to resist arrest and acted in conformity therewith on December 21, 1998"). Rather than viewing the exclusion of evidence concerning the second adult arrest as inconsistent with the admission of evidence concerning the first adult arrest, the government characterizes the court's decision to exclude the former as "finally drawing the line and excluding . . . evidence being offered for an impermissible purpose." *Id.* Judge Johnson seems to have agreed that the defense was treated fairly generously, as he noted, "I did allow, on cross-examination of Duran, the defense, certainly, more latitude than traditionally what is allowed." *See* Trial Tr. at 920 (attached to Fuller's Br.).

The two defendants argue that they sought to admit the evidence of Mr. Duran's conduct during his second adult arrest not for the impermissible purpose of "prov[ing] the character of [Mr. Duran] in order to show action in conformity therewith," FED. R. EVID. 404(b), but to prove that it was Mr. Duran's intent and motive to resist being handcuffed and to thus provoke force on the part of the officers. He also argues that the court did not engage in the required Rule 403 balancing.

We hold that the court did not abuse its discretion when it disallowed further probing into the aggravated assault arrest. First, we note that defense counsel stated that "there [were] two times that [Mr. Duran] . . . refused to be handcuffed by officers: once as an adult and once as a juvenile." Trial tr. vol. XI,

at 264. The court allowed numerous questions on cross-examination at to these events, and permitted defense counsel to establish Mr. Duran's prior conviction for aggravated assault of an officer. *See* Aple's Br. at 34 (noting that "the district court restricted cross-examination only after allowing defense counsel to ask Duran twenty-nine questions about his criminal history"). Moreover, as the government points out in its brief, it is not at all clear that Mr. Duran's intent was even relevant to this case. *See id.* at 31 (noting that "Duran's state of mind had no bearing on whether [defendants] were guilty of violating 18 U.S.C. § 242" because "regardless of Duran's state of mind, the jury could find [defendants] guilty if it concluded that Fuller repeatedly kicked Duran in the head as he lay face down on the floor with his hands behind his back").

That the district court "failed to make explicit findings to support a Rule 403 ruling," does not affect this holding. *United States v. Lazcano-Villalobos*, 175 F.3d 838, 847 (10th Cir. 1999). We may conduct a de novo balancing of the prejudicial effect and probative value of evidence. *Lazcano-Villalobos*, 175 F.3d at 847. Unlike *United States v. Howell*, 285 F.3d 1263, 1268 (10th Cir. 2002), where the district court categorically excluded any reference to the nature of the witness's prior convictions, here the district court allowed just that, and allowed further cross-examination with respect to the arrests involving resisting arrest. *See id.* (reversing the district court's blanket exclusion of evidence of the nature

of prior felonies put forth as impeachment evidence under Rule 609). The district court's decision to preclude further questioning into the nature of the prior conviction reflects a balancing of the prejudicial effect and the probative value of such evidence.

### b. Extrinsic evidence: Testimony of Officer Smith

Mr. Lipscomb and Mr. Fuller next argue, similarly, that the district court abused its discretion when it refused to allow the testimony of Sergeant Fred Smith, the Clovis, New Mexico police officer who had arrested Mr. Duran on his earlier juvenile conviction for resisting arrest. The district court allowed the defense to cross-examine Mr. Duran regarding this offense, once again for purposes of showing that Mr. Duran intended to resist being handcuffed. *See* Trial Tr. vol. XI, at 262 (declining to allow cross-examine regarding other juvenile arrests but holding that "I do think the resisting, if it's an offense that relates to being hostile towards authority, then I think it's fair game on cross-examination").

On cross-examination, Mr. Duran testified that he could not remember the details of that arrest. Mr. Fuller's counsel then sought to introduce extrinsic evidence, in the form of testimony from the arresting officer, of Mr. Duran's refusal to be handcuffed during that arrest. The defense argued that the extrinsic evidence was admissible under Rule 404(b) as evidence of Mr. Duran's intent to provoke the use of force and under Rule 401 as "direct rebuttal evidence of the

[g]overnment's theory that Duran was too small in size to have physically resisted being handcuffed by four large officers." Fuller Br. at 26.

The government countered 1) that Mr. Duran's actions as a juvenile were too remote and dissimilar to be relevant under Rule 401, 2) that the evidence the defense sought to introduce was too prejudicial under Rule 403, and 3) that extrinsic evidence of a "bad act" is inadmissible under Rule 404(b). The court agreed with the government, holding that

> [i]n terms of following the analysis under the rules under 404 and 403 and relevancy, in my review of the rules, I believe that the government's argument tracks the rules. I think . . . it's just too remote and it's beyond 401 relevancy, and again, I just don't feel that it's a proper use of 404(b).

Trial Tr. vol. XIII, at 921.

The record in this case sheds light on the court's appraisal of the evidence. *See Lazcano-Villalobos*, 175 F.3d at 847. The district court carefully considered Mr. Duran's criminal history. It noted that "if [Mr. Duran] has a pattern of conduct of basically resisting authority, whatever that authority is, I do think that should be able to be gone into on cross-examination." Trial. tr. vol. XI, at 261. The court recognized that "[n]ormally, a juvenile adjudication would not [be admissible]" but made an exception to show a "pattern of resisting authority." *Id.*

The court heard argument several times on this and related issues. Government counsel argued that the testimony was not "even in the realm of

-37-

404(b) intent evidence" but rather it "is evidence being offered to show action in conformity with a characteristic." Trial tr. vol. XIII, at 914; *see Lazcano-Villalobos*, 175 F.3d at 847 (considering counsel's arguments as to Rule 403). The court noted that such a reason for admitting the evidence "is expressly not allowed by the rule." Trial tr. vol. XIII, at 914.

Government counsel also argued that under Rule 403, the proffered testimony was unduly prejudicial, because it is being used to show that Mr. Duran "has a propensity to act" a certain way. *Id.* Finally the government argued that the testimony was not relevant.

The court recognized that it allowed "more latitude than traditionally what is allowed in the . . . traditional [Rule] 609 impeachment [setting]. I didn't allow the defense quite as much latitude as the defense wanted, certainly more than what the government wanted." *Id.*. vol. XIII, at 920. We agree that admitting the extrinsic evidence could have impermissibly suggested that Mr. Duran had a propensity to act in a certain manner. *See Hynes v. Coughlin*, 79 F.3d 285, 292 (2d Cir. 1996) (holding that the district court erred in admitting the disciplinary record of a prisoner who became a victim of excessive force because "[t]hough defendants stated that they were not offering [the victim's] disciplinary records in order to show his 'propensity' for violence . . . , their lip service to the proper principle cannot alter the fact that throughout the trial, . . . the information in [the

victim's] disciplinary records was offered in order to show (1) that [he] had an aggressive character, and (2) that it was therefore more likely than not that he was the aggressor on the occasions in question").

We hold that the district court did not abuse its discretion in going no further. It consistently expressed hesitation with respect to Mr. Duran's juvenile adjudication. *See id.* vol. XI, at 261; vol. XIII, at 921. The juvenile arrest occurred when Mr. Duran was sixteen. He testified that he fled the police and resisted arrest because he was "trying to get away." Aple's Br. at 33 (quoting Trial tr. vol. XI, at 306). In contrast, Mr. Duran testified that he resisted being handcuffed by the correctional officers in this instance because he thought the officers were going to beat him and he "feared for [his life]." *Id.* (quoting Trial tr. vol. XI, at 280, 326). The court acted well within its discretion when it concluded that the evidence was too remote to be relevant and too prejudicial to be admissible under Rule 403, and that these two situations were not sufficiently analogous to satisfy the relevancy requirement of Rule 401.

Moreover, the government's concerns about the relevance of Mr. Duran's intent in general, stated above, apply here as well. If, as witnesses testified, the defendants beat and kicked Mr. Duran while he was on the ground with his hands behind his back, his state of mind is irrelevant, as the force would have been excessive regardless of Mr. Duran's subjective state of mind. *See Palmquist v.*

-39-

*Selvik*, 111 F.3d 1332 (7th Cir. 1997) (holding that the district court did not abuse its discretion in excluding evidence that a victim of excessive force intended to provoke police to kill him because "[a]t issue is the objective reasonableness of the defendant's] actions . . . , not the *victim's* reasons"). We are not left with a "definite and firm conviction that the trial court made a clear error of judgment" in deciding to exclude the extrinsic evidence, and as such, we see no justification for disturbing the district court's evidentiary ruling. *Talamante*, 981 F.2d at 1155.

### c. Habit Evidence Under Rule 406

Mr. Lipscomb and Mr. Fuller also argue, for the first time on appeal, that the evidence discussed in 1 and 2 above should have been admitted as evidence of habit or routine pursuant to FED. R. EVD. 406. Because this argument was not before the district court, we review it only for plain error. *See United States v. Wilson*, 107 F.3d 774, 782 (10th Cir. 1997). Rule 406 provides that

> [e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

According to our caselaw

> [a] habit is a regular practice of meeting a particular situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving a hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

-40-

*Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1232 (10th Cir. 2001) (internal quotation marks omitted); *see also Perrin v. Anderson*, 784 F.2d 1040, 1046 (10th Cir. 1986) (defining "habit" as "a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances") (quotation marks omitted). Based on this definition, we have held that "[a]nnouncing the seizure of child pornography upon walking into a video rental store is not a semi-automatic act and could not serve as a basis for habit evidence." *Id.* We have also held that "[f]ive incidents ordinarily would be insufficient to establish the existence of a habit." *Perrin,* 784 F.2d at 1046.

We agree with the government's assessment of appellants' argument: "it constitutes an untenable attempt to circumvent restrictions on character evidence by repackaging it as habit evidence." Aple's Br. at 35. The district court did not commit error, much less plain error, when it excluded evidence regarding Mr. Duran's history of resisting arrest.

We also reject Mr. Lipscomb's cumulative error argument. Having found no error, there is no basis for this contention.

**D. Sentencing Challenges**

1. Post-*Booker* Appellate Review

We retain "the same jurisdiction to review guidelines sentences as [we] had before the Supreme Court's decision in *Booker*." *United States v. Sierra-Castillo*,

-41-

405 F.3d 932, 936 n.2 (10th Cir. 2005). In considering the application of the sentencing guidelines, we review the district court's factual findings for clear error, and its legal determinations de novo. *United States v. Dillon*, 351 F.3d 1315, 1318 (10th Cir. 2003). We "give due deference to the district court's application of the guidelines to the facts." *United States v. Norris*, 319 F.3d 1278, 1284 (10th Cir. 2003).

2. Sentencing challenges

The base offense level for a conviction under § 242 is governed by United States Sentencing Guideline 2H1.1, "Offenses Involving Individual Rights," which directs the court to apply to greatest offense level of:

> (1) the offense level from the offense guidelines applicable to any underlying offense;
> (2) **12**, if the offense involved two or more participants;
> (3) **10**, if the offense involved (A) the use of threat of force against a person or (B) damages or the threat of property damages;
> or (4) **6** otherwise.

USSG § 2H1.1.

For each defendant, the PSR recommended that the underlying offense in this case was aggravated assault. As to each, the district court agreed, and applied a base offense level of 15, pursuant to USSG § 2A2.2, the aggravated assault guideline to each defendant. For each defendant, the district court applied an adjustment under USSG § 2A2.2(b)(2)(B) for an increase of four levels for the use of a dangerous weapon (Mr. Fuller's boots) during the assault.

-42-

After recapping the district court's sentencing of each defendant, we will address the defendants' challenges to the district court's (1) cross-reference to § 2A2.2 aggravated assault, rather than to simple battery, when it sentenced the defendants; (2) the characterization of Mr. Fuller's work books as dangerous weapons; and (3) Mr. Serrata's and Mr. Lipscomb's argument that the district court double counted when it factored in Mr. Fuller's work boots as dangerous weapons. We hold that the district court's cross-reference to aggravated assault, and its inherent finding that the work boots constituted dangerous weapons, were each a correct applications of the guidelines. We also conclude that the district court did not double count when it calculated the defendants' sentences.

a. Mr. Fuller's Sentence

After applying the four-level increase for the use of a dangerous weapon to Mr. Fuller's sentence, the district court applied a two-level increase for the specific offense characteristic for bodily injury under USSG § 2A2.2(b)(3)(A). The district court applied a six-level increase because the offense was committed under color of law, under USSG § 2H1.1(b)(1)(B).

Next, the court imposed a two-level increase for restraint of the victim under USSG § 3A1.3, and a two-level increase for an aggravating role as an organizer, leader, manager, or supervisor of criminal activity under USSG § 3B1.1(C). Finally, the court imposed a two-level increase for obstruction of

justice under USSG § 3C1.1 for a total offense level of 33, criminal history category I.

The court granted Mr. Fuller's motion for a downward departure under USSG § 5K2.0, which resulted in a total offense level of 28, criminal history category I, resulting in a guideline range of 78 to 97 months. The court imposed a sentence of 78 months of imprisonment (58 months for counts I, III, and V to run concurrently and 20 months for Court IV to run consecutively).

Mr. Fuller objected to the PSR, arguing that the court erred when it used the aggravated assault guideline, and also challenging the district court's assessment of his boots as a dangerous weapon under § 2A2.2. Mr. Fuller reasserted these challenges at the sentencing hearing. On appeal, Mr. Fuller argues that the district court erred when it applied § 2A2.2 (aggravated assault) and when it applied a four-level enhancement for use of a dangerous weapon.

b. Mr. Serrata's Sentence

The district court similarly increased Mr. Serrata's sentence from the base level of 15, adding four levels for the use of a dangerous weapon, two levels for the infliction of bodily injury, six levels for acting under the color of law, two levels for the physical restraint of the victim, and two levels for the obstruction of justice, resulting in an offense level of 29, criminal history category I. The district court found mitigating circumstances under § 5K2.0 and applied a five-

level downward departure. The total offense level was thus 24, with a criminal history category I, and a sentencing range of 51 to 63 months. The district court sentenced Mr. Serrata to 51 months on each count, to be served concurrently.

Mr. Serrata also objected to the characterization of Mr. Fuller's boots as a dangerous weapon, which resulted in a four-level adjustment to his offense level. Mr. Serrata raises this contention again on appeal.

### c. Mr. Lipscomb's Sentence

Mr. Lipscomb was convicted of counts IV (conspiracy, in violation of 18 U.S.C. § 371 and V (obstruction of justice by witness tampering in violation of 18 U.S.C. § 1512(b)(3). The determination of his sentenced is thus governed by USSG § 2J1.2, the guideline relating to obstruction of justice.

When the offense involves obstruction, the investigation or prosecution of a criminal offense, the accessory after the fact guideline is used. *Id.* § 2J1.2(c)(1). With exceptions not applicable here, this section requires a base offense level six levels less than the offense level of the underlying crime, *see id.* § 2X3.1. In this case, the district court determined the underlying crimes to be the aggravated assault against Mr. Duran.

Having concluded that the conduct involved Mr. Fuller's conviction for 18 U.S.C. § 242, which constituted an aggravated assault with a base offense level of 15, the court found that there should be a four-level increase for "bodily injury"

pursuant to 2A2.2(b)(3)(A); a six-level increase for "under color of law," pursuant to § 2H1.1(b)(1)(B); and a two-level increase for a physically restrained victim, pursuant to § 3A1.3. The court then reduced the offense level by six levels pursuant to §§ 2J1.2 and 2X1.3 (obstruction of justice and accessory after the fact).

Mr. Lipscomb objected to the offense level based upon "aggravated assault," and increases in the offense level based upon "the use of dangerous weapon," and "physically restrained victim." The district court reduced the offense level by two levels because of Mr. Lipscomb's "minor role" in the offense for a final offense level of 21, criminal history category II. Later in the hearing, the court granted Mr. Lipscomb's motion to downward departure and departed five levels for a final offense level of 16, category II, with a sentencing range of 24-30 months. The court sentenced Mr. Lipscomb to 24 months of imprisonment. Mr. Lipscomb adopts by reference Mr. Serrata's argument regarding the four level increase for the use of a dangerous weapon.

### d. § 2A2.2 Aggravated Assault Cross Reference; and the Characterization of Work Boots as a Dangerous Weapon

Mr. Fuller challenges the district court's reference to § 2A2.2 (aggravated assault), which provides for a base offense level of 15, and contends that the court should have cross-referenced to § 2A2.3 (minor assault), which carries a base level of 6. Pursuant to § 2H1.1, the court must take the most severe base offense

level, and § 2H1.1 instructs that the level should be 12 if two or more individuals were involved.

Mr. Fuller and his codefendants challenge the four-level increase for the use of a dangerous weapon. Because the resolution of each challenge requires our determination of whether the district court validly characterized Mr. Fuller's work boots as a dangerous weapons, we will examine the challenges together.

We review the district court's interpretation and application of the guidelines de novo. *United States v. Dalton*, 2005 WL 1283850, *2 (10th Cir. June 1, 2005); *United States v. Doe*, 398 F.3d 1254, 1257 n.5 (10th Cir. 2005). The guidelines define "aggravated assault" as a felonious assault that involves (A) a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon; (B) serious bodily injury; or (C) an intent to commit another felony. USSG § 2A2.2 cmt. n. 1. Minor assault is defined as "a misdemeanor assault, or a felonious assault not covered by § 2A2.2." USSG § 2A2.3 cmt. n. 1. For both § 2A2.2 and § 2A2.3, a "dangerous weapon" "has the meaning given that term in §1B1.1, Application Note 1. It includes any instrument that is not ordinarily used as a weapon (*e.g.*, a car, a chair, or an ice pick) if such instrument is involved in the offense "with the intent to commit bodily injury." § 2A2.2 cmt. 1(D).

Section 1B1.1 defines a dangerous weapon as

(I) an instrument capable of inflicting death or serious bodily injury; or
(ii) an object that is not an instrument capable of inflicting death or serious bodily injury but
> (I) closely resembles such an instrument; or
> (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

USSG § 1B1.1.

United States Sentencing Guideline § 2A2.2(b)(2)(B) provides for a four-level increase in offense level when a dangerous weapon is used in the assault. *See* USSG § 1B1.1, comment. (n.1(d)) ("Where an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon."). The district court concluded that whether or not an instrument is a dangerous weapon "turns on, if the instrument that is used or involved in the offense is used with the intent to commit bodily injury. . . . [T]he evidence established that the kicking of the inmate's head with boots when the inmate was restrained . . . warrants the imposition of the four-level increase." Rec. vol. XIX, at 77.

According to Mr. Fuller, because Mr. Duran did not suffer serious bodily injury because he was promptly released from the hospital. Thus, Mr. Fuller argues the district court must have erroneously concluded that Mr. Fuller intended to commit bodily injury to Mr. Duran, when in fact Mr. Fuller sought to gain

physical control of Mr. Duran.  We note that Mr. Serrata and Mr. Lipscomb concede "[t]his is an aggravated assault because [Mr. Fuller] kicked Mr. Duran numerous times causing bodily injury."  Serrata Br. at 35.[4]

There is no question that Mr. Fuller, surrounded by other correctional officers, repeatedly used his boots with sufficient force to cause Mr. Duran, who was unquestionably on the ground at the time, head injuries.  *See* Fuller's Br. at 32 ("The jury's verdict finding that Fuller kicked Duran more than once in the head as charged in the indictment must be accepted"); § 1B1.1, comment. n.1(b) ("bodily injury" means any significant injury, *e.g.*, injury that is painful and obvious or is of type for which medical attention ordinarily would be sought).  For the district court to conclude the boots to be a dangerous weapon, it did not have to find "that the boots would somehow cause more serious injury than any other type of normal footwear" as Mr. Serrata suggests.  Serrata Br. at 33, 35.  Rather, the court may find that "'in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs.'" *United States v. Tissnolthtos*, 115 F.3d 759, 763 (10th Cir. 1997) (holding a piece of firewood to be a dangerous weapon) (quoting *United States v. Dayea*, 32 F.3d

---

[4]Pursuant to FED. R. APP. P. 28(I), Mr. Lipscomb adopted by reference Mr. Serrata's brief with respect to sentencing issues.  *See* Lipscomb's Br. at 27.

1377, 1379 (9th Cir. 1994)); *see also United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (concluding that "a belt and a shoe can be dangerous weapons" for purposes of 18 U.S.C. § 113). Given the circumstances before it, the district court correctly considered the boots to be dangerous weapons.

e. The Double-Counting Challenge

To the extent Mr. Serrata and Mr. Lipscomb suggest the district court double-counted the boots, because the presence of a dangerous weapon "is already factored into the guideline calculus" through the application of § 2A2.2, our circuit has already rejected this argument. *United States v. Duran,* 127 F.3d 911, 918 (10th Cir. 1997) (" If the Sentencing Commission had intended to prohibit double counting under § 2A2.2, we believe it would have so provided, as it has in other sections of the guidelines."); *see United States v. Rucker*, 178 F.3d 1369, 1373 (10th Cir.1999) (holding that no improper double counting of separate enhancement provisions has occurred when they "do not necessarily overlap, are not indistinct, and do not serve identical purposes") (emphasis omitted). Having concluded that the district court correctly found Mr. Fuller's boots to be a dangerous weapon, each of the defendants' challenges to their respective sentences must fail.

**E. The Government's Cross-Appeal on the Downward Departure**

The district court granted each of the defendants a five-level downward

departure pursuant to USSG § 5K2.0. The government has filed a cross-appeal

arguing that these departures were unwarranted. The government challenges the

district court's grant of a five-level downward departure for each defendant. The

government maintains that the district court predicated its downward departure on

a combination of impermissible factors, and emphasizes that there is nothing so

atypical about any of the defendants that would justify a deviation from their

respective sentencing guidelines ranges in this case.

1. The district court's grant of the five-level downward departure

The defendants requested sentencing departures based on aberrant behavior

pursuant to USSG § 5K2.20, victim misconduct pursuant to USSG § 5K2.10, and

other grounds pursuant to USSG § 5K2.0. The court denied the defendants'

requests for departures for aberrant behavior and victim misconduct, finding that

"those requested departures do not meet the requirements set forth in the

sentencing guidelines or the requirements of controlling Supreme Court and Tenth

Circuit precedent." Sentencing Tr. at 58.

The court did, however, grant each of the defendants a departure pursuant to

USSG § 5K2.0, which provides for downward departures if

> the court finds, pursuant to 18 U.S.C. 3553(b)(1), that there exists an
> aggravating or mitigating circumstance . . . of a kind, or to a degree, not
> adequately taken into consideration by the Sentencing Commission in
> formulating the guidelines that, in order to advance the objectives set
> forth in 18 U.S.C. 3553(a)(2), should result in a sentence different from
> that described.

USSG § 5K2.0 (policy statement). The commentary to § 5K2.0 explains that departures are intended for "*extraordinary* case[s] that, because of a combination of such characteristics or circumstances, differ[] significantly from the heartland cases covered by the guidelines."

The district court concluded that each defendant's case was not an ordinary one and fell outside the heartland of cases based on the totality of the circumstances. The court then departed on each defendant's family ties and responsibilities, employment history, and civic, charitable, and public service activities. In addition, the court noted Ms. Serrata's educational history, and Mr. Serrata's and Mr. Fuller's lack of criminal history.

2. Standard of Review

In order to determine whether a family circumstances departure was permissible, we need to consider the applicable standard of review of the District Court's decision. "*Booker* excised the statutory provision of the Sentencing Reform Act providing for the standard of review of sentences on appeal, 18 U.S.C. § 3742(e)," and replaced it with review for "reasonableness." *United States v. Sierra-Castillo*, 405 F.3d 932, 936 n.2 (10th Cir. 2005). The Court "left intact the section providing for appellate review of sentences, 18 U.S.C. § 3742(a)." *Id.* n.3 (citing *Booker*, 125 S. Ct. at 765 (noting that § 3742(a) continues to provide for appellate review of guidelines sentences)). "Pursuant to § 3742(a), this court

therefore continues to have the same jurisdiction to review guidelines sentences as it had before the Supreme Court's decision in *Booker*." *Id.*; *see Doe*, 398 F.3d at 1256; *see also United States v. Ruiz-Alonso*, 397 F.3d 815, 817 (9th Cir. 2005) (applying § 3742(b)).

We agree with the Second Circuit that, "[i]n the absence of a statutory de novo standard of review, we select the appropriate standard according to the nature of the issue presented." *United States v. Selioutsky*, 2005 WL 1253478, at *4 (2d Cir. May 27, 2005) (reviewing downward departure for family circumstances under an abuse of discretion standard). Before Congress amended § 3742(e) and required our de novo review of departures, "[w]e review[ed] departures from the guidelines under a unitary abuse-of-discretion standard, giving deference to essentially factual questions and plenary review to those that are essentially legal." *United States v. Concha*, 294 F.3d 1248, 1251 (10th Cir. 2002). Because the sentencing judge has discretion with respect to departures, *see* USSG § 5K2.0 (noting that the court "may depart"), we consider whether the district court abused (or exceeded) its discretion in using a family circumstances departure to adjust the defendants' guidelines sentence.

This standard includes the following inquiries:

(1) whether the factual circumstances supporting a departure are permissible departure factors;
(2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus

-53-

warranting a departure,
(3) whether the record sufficiently supports the factual basis
underlying the departure, and
(4) whether the degree of departure is reasonable.

*United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997). We have described

the first inquiry as a legal question and the second as essentially a factual

question. *Id.* We note that what constitutes a guideline's heartland is a legal

question and our review on that question is not deferential. *Id*. at 1303 n.4 (10th

Cir. 1997).

In reviewing the district court's downward departure, we recognize that

before Booker these discretionary departures were considered against a mandatory

sentencing scheme, while after *Booker* the guidelines are entirely advisory. *See*

*Booker*, 125 S. Ct. at 765. Our post-*Booker* cases have noted that *Booker*'s

reasonableness review is inappropriate for a pre-*Booker* sentence imposed under

the then-mandatory scheme. *See, e.g., United States v. Souser*, 405 F.3d 1162,

1165 (10th Cir. 2005). Nonetheless, in the context of our review of this particular

discretionary degree-of-departure question, we are informed by, and must take

account of, the fact that the district court would have enhanced discretion upon

remand after *Booker*. Moreover, even in an exclusively pre- *Booker* context, "we

give due deference to the district court and will not reverse absent an abuse of

discretion." *United States v. Jones*, 332 F.3d 1294, 1300 (10th Cir. 2003) (citation

omitted).

As part of our review, we consider the district court's stated reasons for choosing this particular sentence in light of the 18 U.S.C. § 3553(a) sentencing factors, which include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a), "the need for just punishment, deterrence, protection of the public, correctional treatment, the sentencing pattern of the Guidelines, the policy statements contained in the Guidelines, and the need to avoid unwarranted sentencing disparities." *United States v. Collins*, 122 F .3d 1297, 1308-09 (10th Cir. 1997) (quotation omitted). We note that "[i]n addition to excising the PROTECT Act provision, § 3742(e), . . . *Booker* also excised § 3553(b) and its narrow prescription for when departures are warranted. *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005); *Booker*, 125 S. Ct. at 764. "At the same time, however, the district court's discretion should be informed by a proper understanding of the Guidelines. *See United States v. Sierra-Castillo*, 405 F.3d 932, 936 n.2 (10th Cir. 2005); *see also United States v. Brady*, 417 F.3d 326, 332-33 (2d Cir. 2005); *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005).

### 3. The court's factual findings

The court made the following findings as to each defendant:

#### a. Mr. Fuller

The court identified five factors in support of its decision to grant Mr.

Fuller a downward departure: (i) family ties and responsibilities; (ii) employment record; (iii) lack of a criminal record; (iv) community support; and (v) civic, charitable and public service.

The district court noted that Mr. Fuller is married with a working spouse and a one-year-old child, and that to lose Mr. Fuller's income will "place a financial burden" on the family. Rec. vol. XX, at 79. The district court found that Mr. Fuller has been a corrections officer since 1995, and was thought to be an honest officer and a team builder. His evaluations were all positive. The district court also emphasized eight letters in evidence indicating community support for Mr. Fuller's good character. Finally, the court observed that Mr. Fuller was actively involved in community service, including school projects and little league baseball.

### b. Mr. Lipscomb

The court identified similar factors with respect to Mr. Lipscomb:

First family ties and responsibilities . . . The defendant is married . . . and he does provide care for his 12-year-old stepson.
    Mr. Lipscomb has maintained relatively stable employment . . . . Although his wife is employed, [his] incomes provided added financial income that, should it stop, the defendant's wife and stepson would experience financial difficulties.
    The second category is civic, charitable, and public services. Mr. Lipscomb is actively involved in his community.

Id. at 61. The district court noted Mr. Lipscomb's involvement in various church group activities, and Elks Lodge volunteer work, where he has donated repair

-56-

services, provided food for senior citizens, and donated gifts for needy children.

### c. Mr. Serrata

As to Mr. Serrata, the court noted that the combination of the following factors warranted a downward departure: "The defendant is married . . . [and is] planning on having a family in the future." *Id.* at 67. From 1992 – 2002, Mr. Serrata worked as a correction officer in New Mexico and Texas with no disciplinary problems (until this case). He was well-respected and enjoyed promotions to sergeant and later lieutenant.

The district court next considered Mr. Serrata's educational background. He was an athlete in high school, was an active member of the Future Farmers of America, and received two awards of distinction. He also attended two semesters of college. The district court also highlighted Mr. Serrata's community support and charitable service, evidenced by his involvement in his church. Finally, the court noted that Mr. Serrata's had no former "run-ins with the law." Rec. vol. XIX, at 69.

### 4. The district court abused its discretion when it granted the five-level downward departure for each defendant

The government challenges each rationale the district court relied upon for its departures. First, family circumstances are a discouraged factor under the guidelines, *see United States v. McClatchey*, 316 F.3d 1122, 1130 (10th Cir. 2003), and "are not ordinarily relevant in determining whether a sentence should

be outside the applicable guideline range." USSG § 5H1.6. As the government points out, Congress specifically directed the Sentencing Commission to "assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 994(e); *see* USSG § 5H1.2 (policy statement) ("Educational and vocational skills are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range . . . ."); *id*. at § 5H1.5 (policy statement) ("Employment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."); *id.* at § 5H1.6 (policy statement) ("Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."); *id.* at § 5H1.11 (policy statement) ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."). In addition, USSG § 4A1.3 forbids relying on lack of criminal history in granting a downward departure where, as here, the defendant is already classified as criminal history category I because "[a] departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited." *Id.*

"However, even though we give substantial deference to a district court's decision that a discouraged factor justifies departure because it is present in some unusual or exceptional way, we compare the circumstances given for departure in the defendant's case to the circumstances in existing reported Guidelines cases to ensure the district court has not abused its discretion." *United States v. Reyes-Rodriguez*, 344 F.3d 1071, 1074 (10th Cir. 2003); *see United States v. Andrews*, 353 F.3d 1154, 1156 (10th Cir. 2003) (noting that discouraged factors such as those discussed above "can be relied on for a downward departure if the district court finds it 'is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines.'") (quoting USSG § 5K2.0).

Having reviewed our reported cases, we agree with the government that nothing about the defendants' family situations, employment or educational records, or community and public service activities is particularly extraordinary. Mr. Fuller has a wife and a young child, but, as the government points out, his family situation is "typical of many, if not most defendants," Aple's Br. at 54, and he "presented no evidence whatsoever that his child is at risk, or that his wife is incapable of taking care of their child." *Id.* at 55. Mr. Serrata is married without children, but plans to start a family in the future. Once again, this situation is hardly exceptional. Mr. Lipscomb has no children, but assists his wife in providing care for his twelve year-old step-son. Again, his is hardly an

exceptional family situation. *See McClatchey*, 316 F.3d at 1130-31 (10th Cir. 2003) (holding that a defendant's family circumstances were not exceptional despite the fact that defendant's 22 year-old son had severe psychological disorders, requiring constant care and precluding defendant's spouse from working outside the home).

We have repeatedly stated that a "defendant's role as a 'sole caretaker' and a child's need 'to be taken care of' do not render [a case] extraordinary," so it is difficult to understand how a defendant's status as a co-parent might make the situation any more dire. *United States v. Webb*, 49 F.3d 636, 638-39 (10th Cir. 1995); *see United States v. Rodriguez-Velarde*, 127 F.3d 966, 967 (10th Cir. 1997) (surveying the law in other circuits and noting that "a defendant's status as a single parent does not constitute an extraordinary family circumstance warranting departure"); *see also United States v. Dyce*, 91 F.3d 1462, 1466 (D.C. Cir. 1996) (denying that a single mother's family circumstances were exceptional and "underscor[ing] what is implicit in the word 'extraordinary' and explicit in the Guidelines themselves: departures on such a basis should be rare").

All three defendants have worked in corrections for at least some time. As correctional officers, they have displayed leadership skills to varying degrees. Mr. Serrata was promoted to sergeant; Mr. Fuller had been praised for his leadership and received several positive reviews while working within the Texas Department

of Criminal Justice. While the defendants do seem to have had productive careers prior to this incident, we are not convinced that their employment record is so atypical or extraordinary as to warrant a departure under our restrictive case law in this area.

The same can be said of the defendants' community involvement and civic service. Mr. Lipscomb is an active member of his church and a member of the local Elks Lodge. Mr. Serrata is also an active member of his church. Mr. Fuller submitted letters from several community members noting that he "has given his time in various community service events[,] supported the local schools[, and] . . . volunteered his time with the Little League baseball as a coach and umpire." While the defendants' community activities are certainly commendable, it is difficult to conclude that their community involvement is "present to an unusual degree." USSG § 5K2.0. Mr. Serrata's educational record, though perhaps more impressive than that of many criminal defendants, in that he graduated from high school and attended two semesters of college is also not particularly exceptional or atypical.

We hold that not one of these discouraged factors is so present or atypical with regard to any of the defendants as to provide a clear basis for a downward departure. The question then becomes whether the outcome is any different if we look at these factors together, applying as the district court did, a totality of the

circumstances approach. We hold that even when considered in the aggregate, these factors are not enough to support the granting of downward departures. *See McClatchey*, 316 F.3d at 1131-35 (holding that the district court abused its discretion by granting a downward departure to a defendant who displayed significant family responsibilities, an "education and enviable career," and charitable giving and community service). We must therefore remand for resentencing  so that the district court may resentence under a non-mandatory guideline scheme.

### E. *Booker* Errors

After oral argument, the defendants moved to file a supplemental brief, arguing that  their sentences were invalid under *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and we granted the motion. The defendants properly raised their Sixth Amendment issues in a supplemental brief. We apply the holdings in *Blakely* and *Booker* to all cases in which a defendant properly raised an issue under either case. *United States v. Clifton*, 406 F.3d 1173, 1176 n.1 (10th Cir. 2005) (citing *Booker*, 125 S. Ct. at 769). The defendants argue that the district court committed plain error when it engaged in impermissible judicial factfinding and imposed unconstitutional sentences under the guidelines.

In *Booker*, the United States Supreme Court extended its ruling in *Blakely* to invalidate the federal sentencing guidelines under the Sixth Amendment insofar

as they were mandatory.  125 S. Ct. at 756.  It held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  *Id.* at 756.  The Court concluded the guidelines would not offend the Constitution if the sentencing court considered them advisory only.  *Id.* at 749-50.  To this end, in the remedial portion of its opinion, the Court excised those provisions mandating their application.  *Id.* at 756-57.  The Court indicated its decision was applicable to all cases, like this one, on direct review.  *Id.* at 769.

Applying Booker, we have stated:

[T]here are two distinct types of error that a court sentencing prior to *Booker* could make. First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. As a matter of convenience, we will refer to such an error as a "constitutional *Booker* error." Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. While this type of sentence does not violate the Sixth Amendment, such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. We will refer to this second type of error as a "non-constitutional *Booker* error."

*United States v. Gonzalez-Huerta*, 403 F.3d 727, 731-32 (10th Cir.2005) (en banc) (citations omitted).  Regardless of the type of error involved, *Booker* does not

necessitate remand for resentencing in all instances. Instead, "reviewing courts [are] to apply ordinary prudential doctrines, determining, *e.g.*, whether the issue was raised below and whether it fails the 'plain-error test.'" *Booker*, 125 S. Ct. at 769.

### 1. Standard of Review

Although the defendants objected below in the district court to the application of the subject sentencing enhancements, they each failed to raise a Sixth Amendment objection. We therefore review each of their claims for plain error. *See Booker*, 125 S. Ct at 769 (emphasizing that whether a new sentencing hearing is required depends on "ordinary prudential doctrines," such as "whether the issue was raised below and whether it fails the 'plain-error' test"); *see also United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005) (applying plain error test to constitutional *Booker* error).

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta*, 403 F.3d at 732 (internal quotation marks omitted). "We conduct this analysis less rigidly when reviewing a potential constitutional error." *Dazey*, 403 F.3d at 1174 (internal quotation marks omitted).

### 2. The defendants' *Blakely*/*Booker* challenges

Mr. Fuller contends that the following adjustments violated his Sixth Amendment rights:

1. the four-level dangerous weapon increase under § 2A2.2(b)(2)(B)

2. the two-level bodily injury adjustment under § 2A2.2(b)(3)(a)

3. the two-level aggravating role adjustment under § 3B1.1(c); and

4. the two-level restraint of victim adjustment under § 3A1.3.

Absent these adjustments, and before any downward adjustments were calculated, Mr. Fuller's offense level would have been 20, with a criminal history category one, resulting in a sentencing range of 33-41 months.

Mr. Lipscomb objected to the PSR, challenging the adjustments based on the use of a dangerous weapon, and the finding of a physically restrained victim. Without these cross-references and adjustments, according to Mr. Lipscomb, his base offense level (before the downward adjustments), would have been 8, criminal history category II, with a sentence range of 2-8 months.[5] After the

_____

[5] This calculus assumes the court would have applied the § 2A2.3 (minor assault) base offense level of 6. Applying § 2H1.1(a)(2) , the court must apply the greatest offense guideline applicable, or 12 if the offense involved two or more participants. We have already noted that Mr. Lipscomb adopted by reference Mr. Serrata's briefing as to sentencing issues, which included a concession that the assault was aggravated. *See supra* p. 45. Regardless of whether or not we find this argument waived, we disagree with Mr. Lipscomb's conclusion. With the application of the simple assault guideline, and before any upward or downward adjustments, Mr. Lipscomb's base offense level would have been at least 2, which carries a sentencing range of 12-18 months, for criminal

(continued...)

application of the five-level downward departure, Mr. Lipscomb was sentenced to 24 months, the bottom of the applicable guideline range.

Mr. Serrata's brief is not entirely clear on this point, but he appears to challenge only the four-level dangerous weapon adjustment under § 2A2.2(b)(2)(B). Without this adjustment, Mr. Serrata's offense level would have been 25, criminal history category I, with a sentencing range of 57-71 months, before any downward adjustments. After the application of the five-level downward departure, Mr. Serrata was sentenced to 51 months, the bottom of the applicable guideline range.

(i)&(ii). As to each defendant, there was an error that was plain

The district court made several findings based on a preponderance of evidence that the defendants did not admit and the jury verdict alone did not support, pursuant to the then-mandatory Guidelines. For example, the district court clearly erred, as *Booker* later explained, in sentencing the defendants based upon on findings it made by a preponderance of the evidence that their offenses involved a dangerous weapon. *Booker*, 125 S.Ct. at 749 ("Since this fact was found by a judge using a preponderance of the evidence standard, the sentence violated [the defendants'] Sixth Amendment rights."); *Blakely*, 124 S. Ct. at 2537;

_____

[5](...continued)
history category II. *See* § 2H1.1(a)(2).

*Gonzalez-Huerta*, 403 F.3d 727, 730.

Inherent in this finding, is an error with respect to the district court's cross-reference to aggravated assault, based on the use of a dangerous weapon. Similarly, the court erred when it made findings as to bodily injury, aggravating role, and restraint of victim, Moreover, such errors are now "plain" or "obvious." *Johnson*, 520 U.S. at 468 (holding that "where the law at the time of trial [or sentencing] was settled and clearly contrary to the law at the time of appeal–it is enough that an error be 'plain' at the time of appellate consideration"); *Gonzalez-Huerta*, 403 F.3d 727, 730.

(iii). The errors affected the defendants' substantial rights

In order to demonstrate that an error affected his substantial rights, "a defendant must show a 'reasonable probability' that the defects in his sentencing altered the result of the proceedings." *Dazey*, 403 F.3d at 1175 (citing *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004)). "[T]he mere difference between the imposed Guidelines sentence and the sentence the defendant would have received based on the facts found by the jury . . . is [not] sufficient to satisfy the third prong of plain error." *Id.* A defendant may meet his burden in at least two ways:

> First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below

-67-

affected his substantial rights. . . . Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the guidelines range.

*Dazey*, 403 F.3d at 1175.

The defendants succeed under the second approach. The record indicates that the district court, in considering § 3553(a)'s the sentencing factors, would have imposed a lower sentence had it had the discretion to do so. First, section 3553(a) requires sentencing courts to take account of factors such as the "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the range suggested by the Guidelines, *id.* § 3553(a)(4), and the need for sentencing uniformity for defendants with similar criminal histories and found guilty of similar conduct, *id.* § 3553(a)(6).

When the district court granted the five-level downward departure, it considered several near-identical factors recommended by § 3553(a)(1). The district court considered the nature of the offense, and found that the use of force Mr. Lipscomb and Serrata "was justifiable." Rec. vol. XIX, at 75. As established above, the district court reviewed the defendants' characteristics, including their family ties and responsibilities; employment history; and civic, charitable, and public service activities, and felt these justified a lower sentence. *See also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the

background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); USSG § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").

In addition, the district court noted Ms. Serrata's educational history, and Mr. Serrata's and Mr. Fuller's lack of criminal history, which persuaded it to grant a downward departure, albeit erroneously. *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 821 (10th Cir. Apr. 13, 2005) (reversing on plain error review where the defendant "present[ed] a compelling case that objective consideration of the § 3553(a) factors warrant[ed] a departure, and perhaps a significant departure, from the sentence suggested by the Guidelines").

We note there appears to be tension among the statutes and guidelines. *Compare* § 3553(a) and § 3661 *with* § 994(e) (recognizing the "general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant"); *compare* USSG § 5H1.2 (education and vocational skills), § 5H1.5 (employment record), and § 5H1.6 (family ties and responsibilities) *with* § 1B1.4 ("[T]he court

may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."); *see also* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on The Discretion of Sentencers*, 101 Yale L.J. 1681, 1715, 1754 (1992) (noting that "these 5H policy statements squarely conflict with guideline section 1B1.4 and are inconsistent with §§ 3553(a) and 3661 of title 18" and calling for "the judiciary to prod the Commission and the Congress to get the guidelines back on course"). Such tension is certainly relevant when we review whether extraordinary circumstances warranted a downward departure. But, in the wake of *Booker*, the incongruity diminishes as sentencing judges are encouraged to exercise their discretion. Post-*Booker,* the district court "has latitude, subject to reasonableness review, to depart from the resulting Guideline ranges." *United States v. Magallenez*, 408 F.3d 672, 685 (10th Cir. 2005).

Perhaps most telling as to the likelihood that, upon remand, the district court would impose a sentence outside the guidelines range, is that the district court repeatedly expressed its dissatisfaction with the guidelines, and reiterated that it would sentence each defendant to probation if the guidelines so permitted. *See* Rec. vol. XIX, at 59-60 ("[I]f this were a case in state court, I think, certainly, probation would be warranted. But these guidelines do not give me that flexibility.); 66 ("[i]f I had the discretion that I wish I had, I would probate most,

if not all, of the sentence.  And so my hands are tied."); 74-75 ("If I had discretion

. . . I would [structure a sentence where there was a minimal amount of jail time

and a significant amount of probation time."); 78 ("If I were in state court, I think

a substantial – maybe be all of the sentence would be probated, but I don't have

that kind of discretion.").  Furthermore, the district court sentenced each

defendant to the lowest possible sentence within the applicable guideline range.

We conclude that the defendants have thus satisfied their burden to show that the

enhancements imposed by the district court affected their substantial rights.

> (iv) The error seriously affects the fairness, integrity, or public
> reputation of judicial proceedings

The defendants also have the burden of persuading us that the error

seriously affected the fairness, integrity, or public reputation of judicial

proceedings.   We have identified several non-exclusive factors that may lend

support to the defendants' contentions.

> Evidence that would tend to support an exercise of our discretion
> under this standard might include, for example: (a) a sentence
> increased substantially based on a *Booker* error; (b) a showing
> that the district court would likely impose a significantly lighter
> sentence on remand; (c) a substantial lack of evidence to support
> the entire sentence the Guidelines required the district court to
> impose; (d) a showing that objective consideration of the §
> 3553(a) factors warrants a departure from the sentence suggested
> by the Guidelines; or (e) other evidence peculiar to the defendant
> that demonstrates a complete breakdown in the sentencing
> process.

*United States v. Dowlin*, 2005 WL 1155882, at *18 (10th Cir. May 17, 2005)

(citations omitted).

Because of the complexity of the sentences, and the variety of adjustments, it is difficult to approximate exactly what sentence each defendant would have received but for the *Booker* error. Nevertheless, we are confident that in each case, the resulting sentence would have been significantly lighter than the sentence each defendant actually received.

As to the second factor, the record clearly established that the district court would impose a significantly lighter sentence on remand, given the district court's statements about probation. As to the substantial lack of evidence in the record, this factor appears to weigh against the defendants. There is little doubt Mr. Duran suffered physical injury. Similarly, the court's conclusion that the boots were dangerous weapons, that the defendants engaged in obstruction of justice, and that Mr. Fuller played an aggravating role, find support in the record.

However, as to the next factor, we have already established that consideration of the § 3553(a) factors warrants a departure. *See Trujillo-Terrazas*, 405 F.3d at 819 (explaining that to allow a potential "mismatch between the sentence suggested by a principled application of the post-*Booker* sentencing framework and the actual sentence given to [the defendant] would call into question the fairness, integrity, and public reputation of judicial proceedings").

Finally, this case is particularly peculiar because the district court judge repeatedly stated that he was constrained by the mandatory nature of the guidelines, without which he would sentenced each defendant to probation. We cannot ignore that the district court in this case would likely impose "a substantially lighter discretionary sentence on remand." *Gonzalez-Huerta*, 403 F.3d at 743-744 & n.4 (Ebel, J., concurring in part, dissenting in part). "A review of federal appellate decisions considering whether to correct unobjected-to sentencing errors reveals that the key concern has been whether correct application of the sentencing laws would likely significantly reduce the length of the sentence." *United States v. Brown*, 316 F.3d 1151, 1161 (10th Cir. 2003). As we held in *Clifton*, "[o]n this record, therefore, we conclude the Guidelines process failed," *Gonzalez-Huerta*, 403 F.3d at 747 (Hartz, J., concurring), and to "leave standing this *Booker* error would result in a miscarriage of justice." *Clifton,* 406 F.3d 1184.

Although the Sentencing Guidelines are no longer mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." 125 S. Ct. at 767. Accordingly, on remand, the district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. The court should consider this sentencing range along with the other factors described

in 18 U.S.C. § 3553(a), and then impose a sentence. If that sentence falls outside the guidelines range, the court should explain its reasons for the departure, as required by 18 U.S.C. § 3553(c)(2). If the "district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard." *United States v. Magallanez,* 408 F.3d 672, 685 (10th Cir. 2005).

## III. CONCLUSION

Accordingly, because we can find no trial error we AFFIRM each of the defendants' convictions. We also agree that the district court did not engage in a misapplication of the guidelines when it determined that Mr. Fuller's boots, as used in the attack upon Mr. Duran, were dangerous weapons under § 2A2.2. We thus agree with the district court's conclusions and application of the guidelines when it cross-referenced § 2A.2.2, and when it enhanced each defendant's sentence by four levels based upon the use of those weapons. We conclude that the district court improperly relied upon findings supporting a five-level downward departure for each defendant, because it relied upon discouraged and irrelevant factors. On remand, the district court's rationale for the extent of its reduction in the defendants' sentences will be reviewed for reasonableness on any subsequent appeal. Finally, with respect to the violation of Sixth Amendment

-74-

rights, we agree that each defendant has established plain error, because each sentence violates the *Booker* prohibition against increasing a sentence based upon facts found by a preponderance of the evidence. Accordingly, we VACATE the defendants' sentences and REMAND for resentencing in accordance with this opinion and with *Booker*.