FILED
United States Court of Appeals
Tenth Circuit

April 28, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 10-1271 <br> (D.Ct. No. 1:09-CR-00157-WYD-1) <br> (D. Colo.) |
| ALTON JOHN SMITH, a/k/a Austin O. Ikeme, | |
| Defendant-Appellant. | |

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BARRETT**, **ANDERSON**, and **BRORBY**, Circuit Judges.

_____


After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

submitted without oral argument.

_____

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Defendant Alton John Smith appeals his conviction on grounds the district court erred in denying his motion for acquittal, arguing the government failed to provide evidence he committed the fraudulent acts for which he was convicted. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm Mr. Smith's conviction.

## I. Procedural Background

Mr. Smith pled not guilty to an indictment charging him with four counts of fraud, in violation of 18 U.S.C. §§ 2 and 1344(1), against Wells Fargo, a banking institution with branch offices in Denver, Colorado; and Security Service Federal Credit Union, another Denver financial institution. During his trial, the government presented witness testimony and other documentary evidence in support of its case against Mr. Smith. At the conclusion of the government's evidence, Mr. Smith offered no testimony or other evidence to rebut its evidence or in support of his defense but moved for acquittal on all four counts, arguing the government failed to prove he is the individual who committed the fraudulent acts or otherwise provide the documents on which the fraudulent acts were perpetrated. The district court denied the motion to acquit, and the jury found Mr. Smith guilty of fraud on all four counts. Thereafter, the district court sentenced him to sixty months imprisonment on each count, to run concurrently.

Through counsel, Mr. Smith now appeals his convictions on three of the four fraud counts, renewing his argument the government failed to prove he is the individual who committed the fraud perpetrated against Wells Fargo and, as a result, claiming the district court erred in denying his motion for acquittal. While he concedes the government proved someone using the fictitious name of Austin Ikeme and fraudulent documents obtained three different loans from Wells Fargo, he argues it failed to prove he was the person who used that identity to obtain the loans or who furnished the fraudulent documents. As to the fourth fraud count concerning an automobile loan, Mr. Smith now concedes the government proved he used the fictitious name Austin Ikeme and provided fraudulent documents to obtain his automobile loan from Security Service. However, he requests resentencing on that count. Finally, in a pro se reply brief which we granted Mr. Smith permission to file, he claims the government failed to prove two of the entities affiliated with Wells Fargo and Security Service and involved in the fraudulent transactions are "FDIC-insured" or "financial institutions," as required for his convictions. In discussing the issues presented, we provide only the material facts necessary to dispose of Mr. Smith's appeal, which are gleaned from the government's evidence presented at trial and which Mr. Smith failed to rebut.

## II.  Factual Background

### A.  Mortgage Counts

To begin, from November 2001 to April 2002, Mr. Smith worked at a branch office of Wells Fargo as a personal banker who opened accounts and took loan applications.  While he did not work in underwriting or mortgage loans, he was involved in home equity lines of credit tied to first mortgage purchases.  Some years later, after leaving Wells Fargo's employment and during the commission of the fraudulent schemes on which Mr. Smith was convicted, he became acquainted with Ben Serrano, who worked for Golden Design Group, which built homes for sale, including a home at 5686 Vistancia Court in Parker, Colorado.

Starting in 2006, a series of checking accounts were opened at a branch office of another Denver financial institution, Bank of the West, and through the use of those accounts, the instant fraud schemes were perpetrated.  First, Mr. Smith's wife, Stacy Smith, opened a personal checking account at Wells Fargo in 2006; on September 19, 2007, Mr. Smith also opened a checking account at Bank of the West for his business, Marrick Entertainment, using his name as a signatory and indicating it was for the purpose of obtaining a mortgage.  Shortly thereafter, on November 1, 2007, someone presenting himself as Austin Ikeme also opened a personal checking account at Bank of the West, providing a fake

date of birth of September 20, 1972, and false Social Security number ending in 5791.[1]  On November 5, 2007, only four days after the Ikeme checking account was opened, another signatory was added to the Marrick Entertainment checking account in the fictitious name of Austin Ikeme, with a false date of birth, driver's license, and Social Security number for that person.

A later investigation by an FBI agent, Scott Doner, revealed Marrick Entertainment was incorporated in Nevada in September 2007, with Alton J. Smith and Alton J. Smith II listed as corporate officers.  However, paperwork filed in November 2007 showed Mr. Ikeme holding all officer positions, while paperwork filed in December 2007 showed a transfer of all officer positions back to Alton J. Smith.  In addition, the Colorado incorporation documents of Marrick Entertainment filed in September 2007 showed the registered agent and incorporator to be Alton Smith.  During the investigation, Agent Doner also found no evidence Marrick Entertainment actually engaged in any business.

Sometime in late 2007, David Bliesmer, a loan officer with Colorado Mortgage Alliance – an entity associated with Wells Fargo – came in contact, through Mr. Serrano, with a person using the same fictitious name Austin Ikeme

---

[1]  For the protection of the actual person possessing this Social Security number, we refer only to the last four digits of the Social Security number fraudulently used by the fictitious Mr. Ikeme.

and the same false Social Security number ending in 5791 and September 20, 1972 birth date used on the Austin Ikeme personal checking account. The person acting as Mr. Ikeme filed paperwork applying for a $982,000 mortgage loan and a $100,000 second mortgage loan from Wells Fargo to purchase the Vistancia Court residence for sale by Mr. Serrano. Mr. Ikeme was both the buyer and borrower on the closing documents and signed the mortgage loan applications.

A later investigation disclosed the documents used to secure the loans were false or fictitious and included fake California and Colorado driver's licenses for Mr. Ikeme,[2] fictitious income and payroll documents from Marrick Entertainment for Mr. Ikeme, and falsified bank statements for Mr. Ikeme's personal checking account at Bank of the West. These documents falsely indicated Mr. Ikeme worked at Marrick Entertainment for almost eight years, was CEO of the business, earned a monthly gross income of $21,973, held $265,311 in his checking account at Bank of the West, and had assets worth $265,311. In gathering this information and documentation, Mr. Bliesmer only dealt with Austin Ikeme over the telephone, and he received the loan documents and applications from Mr. Ikeme by either fax or email attachment.

---

[2] As explained hereafter, Mr. Smith, using the fictitious name of Austin Ikeme, provided a fake Colorado driver's license at the unsuccessful closing on the Vistancia Court property and later used a fake California driver's license for the successful closing on the same property.

On December 11, 2007, prior to the discovery of these documents being fraudulent, a cashier's check from Mr. Ikeme's personal checking account was presented at the closing on the Vistancia Court residence for the purpose of covering Mr. Ikeme's costs as the purchaser. The funds for the closing came from a company called K & K located in California which, prior to the closing, deposited $125,000 into Mr. Ikeme's personal checking account, and also from Mr. Serrano, who deposited most of an additional $17,000 deposited into the same account. However, the title company refused to close on the transaction because the Colorado driver's license presented to identify Mr. Ikeme appeared fake. As a consequence, the closing did not occur and someone from the title company contacted a representative of Bank of the West about the situation and returned the funds provided, including its refund to K & K of the $125,000 it had previously deposited into the Austin Ikeme checking account. Mr. Bliesmer, who did not attend the closing, called and questioned Mr. Ikeme about the fake driver's license; Mr. Ikeme told him he had gone through a name change, had registered his new name in California, and his previous name had been Alton Smith.

Diane Saia, a Bank of the West fraud investigator, commenced an investigation into the closing and set up an in-person interview with Mr. Smith, who admitted to her that he used the name of Austin Ikeme – the name which

appeared on the personal checking account he attempted to use for his closing costs. Mr. Smith also told her that he was working on legally changing his name to Austin Ikeme, and thought he had successfully done so in California. However, when he provided the purported Colorado paperwork for a name change, it looked completely bogus to her. In addition, he admitted he purchased the Colorado driver's license, at issue at the closing, from somebody off the street in Denver for $250. At trial, Ms. Saia identified Mr. Smith as the person she met with during that meeting.

Meanwhile, Mr. Serrano, acting as an agent for the seller of the Vistancia Court property, contacted another title company, and on December 21, 2007, Mr. Ikeme closed on the property using buyer's funds which came from Stacy Smith's checking account at Bank of the West, where K & K had re-deposited the money it received back from the title company after the failed closing. This money helped to cover the approximate $12,000 in closing costs and $183,812.61 down payment paid by Mr. Ikeme. In addition, rather than using the Colorado license which prevented the previous closing, Mr. Ikeme used a fake California driver's license which apparently did not raise the same suspicions.

At trial, Mr. Bliesmer identified the documents used to support Mr. Ikeme's loan applications for the first and second mortgages. He and two Wells Fargo

employees testified the same fraudulent documents, including the fake California driver's license, were used simultaneously by Wells Fargo in closing on both mortgages. He also testified he may have never met the borrower, although he believed he met the person representing himself to be Austin Ikeme at the second closing. However, he did not think he could recognize him any longer and, therefore, was unable to identify Mr. Smith at trial as a person attending the closing. He did, however, recall Mr. Serrano attending the closing.

Following the closing, Lisa Tennyson, a financial crime investigator at Wells Fargo, began an investigation of the loans Mr. Ikeme obtained and discovered numerous falsities in the documentation and information contained therein. In sum, Wells Fargo loaned $1,082,000 to Austin Ikeme for both mortgage loans and, after only one payment was ever made on the property, Wells Fargo foreclosed on the property. The property later sold for only $533,000, resulting in a loss of approximately $550,000.

On December 28, 2007, only a week after the closing, someone applied to open a new checking account at Bank of the West using the false identity of Austin Ikeme and the same fake: (1) Social Security number ending in 5791; (2) September 20, 1972 date of birth; and (3) California driver's license in the name of Austin Ikeme, also using the same September birth date. In attempting to open

the checking account, Mr. Ikeme presented a check for deposit made payable to EMK Products in the amount of $54,000 from Stacy Smith's checking account at Bank of the West. A bank surveillance photograph showed Mr. Smith was the person who obtained the cashier's check.

The signature verification and account application forms listed Mr. Ikeme's address as the Vistancia Court address and provided a telephone number. The teller, who believed the California driver's license presented was fake, immediately contacted the Parker Police Department and turned the cashier's check and other documents over to Detective Jeremy Stucker. When Detective Stucker called the telephone number on the account application form, a male answered identifying himself as Austin Ikeme and agreed to meet him at the police station to discuss the driver's license provided to the bank.

Detective Stucker testified that after Mr. Smith arrived at the station he was able to determine Mr. Smith was the person pictured as Austin Ikeme on the fake California driver's license. In addition, although Mr. Smith first identified himself as being Austin Ikeme, he admitted during their conversation he was in fact Alton Smith and then provided a legitimate Colorado driver's license in his name with his photo and actual Social Security number and date of birth, which were different than those provided for Mr. Ikeme. Mr. Smith also identified the

fake California driver's license as the one he presented to the bank when attempting to set up the new checking account and verified that he went by the name of Austin Ikeme. He also stated the check he intended to deposit came from his wife, Stacy Smith, for the purpose of opening an account for his business, EMK. Mr. Smith then presented a passport photo of himself and a name-change form with his name as well as the name of Austin Ikeme on it and explained it was intended for the Colorado Division of Registration. However, Detective Stucker noticed it contained a different Social Security number than the one on the account application. At trial, Detective Stucker identified Mr. Smith as the person with whom he met after calling the telephone number associated with the newest Austin Ikeme account and Vistancia Court address.

Another detective, Sherry Corcoran, testified she received a report and evidence from Detective Stucker and verified the person in question was Alton Smith. On January 3, 2008, after Mr. Smith attempted to contact her, Detective Corcoran returned his calls by calling the phone number for him provided by Detective Stucker. The person she reached identified himself as Alton Smith and told her there was a misunderstanding at the police department, he was going through a name change, he wanted to prove his name change and business were legitimate, and he could bring documents proving this to the police department.

Detective Corcoran also testified Mr. Smith stuttered on the phone after she pointed out his real birth date was February 18, 1971, while the date of birth on his California driver's license and checking account information he provided was the September date. When asked about the California license, Mr. Smith admitted he purchased it in Los Angeles for $6,000. As to the fake Social Security number ending in 5791, he told her he had no idea whose number it was and that he never used it before. Ultimately, Mr. Smith never produced the promised paperwork, and during a later telephone conversation, when Detective Corcoran asked him about the mortgage loans on the Vistancia Court property, he denied knowing anything about them. She also testified that through the Social Security Administration she learned the Social Security number in question belonged to a female born in 2003.

### B. Personal Line of Credit Count

Testimony of a Wells Fargo investigator also established that in May 2008, someone acting as Austin Ikeme applied by telephone for a personal line of credit from Wells Fargo in the amount $49,700. In submitting the application for the loan, Mr. Ikeme used the same or similar false information used in the two aforementioned mortgage loan applications, including the same fake name, date of

birth,[3] Social Security number, California driver's license, and Marrick Entertainment employer information and monthly income, as well as use of the Vistancia Court address. The application also listed Alton Smith as an additional borrower with a different Social Security number and date of birth, and the form was signed by both Alton Smith and Austin Ikeme. In explaining how the same person might provide two different signatures without raising any suspicion it was the same person, the Wells Fargo investigator pointed out applicants typically sign the application form in front of a bank representative, but if two borrowers exist, they might come in to sign it at different times and even at different branch offices.

In early May 2008, Wells Fargo approved the personal line of credit for Mr. Ikeme in the amount of $49,700. Five days after the loan was approved, $10,000 was drawn in person from the Ikeme line of credit and deposited into the Marrick Entertainment business checking account on which Mr. Ikeme and Mr. Smith were both signatories. During the rest of May and June 2008, the balance of the personal line of credit was withdrawn and moved into the same Marrick Entertainment account. One of these withdrawals occurred on May 14, 2008, in

---

[3] The date of birth listed on the first mortgage application for Mr. Ikeme listed his date of birth as September 20, 1972, while his second mortgage application listed it as June 10, 1972; like the second mortgage, the personal line of credit information listed Mr. Ikeme's date of birth as June 10, 1972.

the amount of $3,000 in the name of Alton Smith; a surveillance photo positively showed Mr. Smith making the withdrawal. Wells Fargo eventually incurred a loss of $49,700 when no payments were received on the loan.

### C. Automobile Loan Count

Sometime in the fall of 2007, Nicholas Michael Wood, who worked at Centennial Leasing and Sales – an automobile dealership – came into contact with Austin Ikeme, whom he met through Ben Serrano. Mr. Wood initially dealt with Mr. Ikeme over the telephone when he leased three cars on behalf of Marrick Entertainment, and Mr. Wood did not meet Mr. Ikeme in person until he delivered the leased vehicles to him at the Vistancia Court address, where he also picked up paperwork from Mr. Ikeme. At that time, Mr. Wood recognized Mr. Ikeme as the person called "Alton" whom he met earlier at a Super Bowl party held at Mr. Serrano's house. Later, in May 2008, Mr. Wood assisted Mr. Ikeme in purchasing a vehicle – a 2008 Chrysler Aspen – including supplying him with the necessary application for a loan from Security Service, which Mr. Ikeme filled out at the dealership and which Mr. Wood witnessed him signing. At trial, Mr. Wood identified Mr. Smith as the person who represented himself to be Mr. Ikeme during these transactions.

In addition, Michael Vernon Dillingham, a representative of Security

Service, testified as to Mr. Ikeme's May 2008 purchase of the Chrysler Aspen from Mr. Wood's automobile dealership. According to him, someone going by the name of Mr. Ikeme obtained an automobile loan from Security Service in the amount of $42,824.32. The application for the loan falsely identified Mr. Ikeme's employer as Marrick Entertainment and stated he earned a monthly income of $9,000. Mr. Ikeme's loan application also listed Stacy and Alton Smith as the named insureds. As with the other loans, Mr. Ikeme defaulted on the automobile loan.

### D. Indictment and Additional Testimony

On September 17, 2009, an indictment issued against Mr. Smith for the four counts of fraud against federally-insured financial institutions in violation of 18 U.S.C. §§ 2 and 1344(1).[4] On October 13, 2009, one month after the indictment

---

[4] Count One (First Mortgage Count) alleged Mr. Smith, using the fictitious identity of Austin Ikeme, a false Social Security number, date of birth, and other false identification documents, knowingly attempted to execute or executed a scheme to defraud Wells Fargo by submitting a mortgage loan application containing fictitious information and supported by false documentation, including fake income and payroll documents associated with Marrick Entertainment and false bank statements from a Bank of the West checking account, for the purpose of obtaining a loan in the amount of $982,000 for the purchase of a home at 5686 Vistancia Court, Parker, Colorado. Count Two (Second Mortgage Count) adopted most of Count One's description of the overall scheme and alleged Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute a scheme to defraud Wells Fargo by submitting a home equity line of credit application to be secured by the property at 5686 Vistancia Court. Count Three (Line of Credit Count) similarly adopted the overall scheme described in Count One and alleged

(continued...)

issued against him, Mr. Smith contacted Diana Dreiling, an employee of Wells Fargo with whom he had worked from November 2001 to April 2002. She had not spoken to him since he left Wells Fargo's employment but accepted an invitation to meet him for lunch the next day. According to Ms. Dreiling, when she met with Mr. Smith he told her his house had been foreclosed on after he hooked up with a builder and the builder represented to him that if Mr. Smith could qualify for a loan, Mr. Smith could get his money back. Mr. Smith explained that when he told them he could not qualify because of his credit rating, they sent him to California for a false identity, but ultimately they did not come through with their promise. He also admitted he knew what he did was wrong but he was desperate.

In addition, he told her Wells Fargo gave him a line of credit and he intended to pay off the loan with funds from a settlement his mother was receiving. He then asked Ms. Dreiling if she could get him the telephone numbers of two people he had worked with at Wells Fargo because he wanted to

---

[4](...continued)
Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute the scheme to defraud Wells Fargo by submitting an application for a personal line of credit in the amount of $49,700. Finally, Count Four (Automobile Loan Count) also adopted most of Count One's description of the overall scheme and alleged Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute a scheme to defraud Security Service by submitting an application for an automobile loan in the amount of $42,834 and secured by a 2008 Chrysler Aspen.

pay off the line of credit loan.  The telephone numbers Mr. Smith requested were for a Wells Fargo investigator and a loan fraud manager.

## III.  Discussion

Through counsel, Mr. Smith now appeals his convictions on three of the four fraud counts, arguing the district court erred in denying his motion for acquittal on those three counts.  In making this argument, Mr. Smith concedes someone used the name of Austin Ikeme and fraudulent documents to obtain the three different loans from Wells Fargo but that the government failed to present evidence establishing Mr. Smith furnished these documents or identify him as the person applying for the Wells Fargo loans.  However, he now concedes the government proved he obtained the automobile loan from Security Service using fraudulent documents but nevertheless seeks resentencing on that count, albeit without providing any discussion in support of such resentencing.  In his pro se reply brief, Mr. Smith also argues the government failed to present evidence showing two of the institutions involved in the fraud schemes, Colorado Mortgage Alliance and Centennial Leasing and Sales, are "FDIC-insured" or "financial institutions," as required to prove the elements of the crimes for which he was convicted.  For the reasons provided below, we soundly reject Mr. Smith's arguments on appeal.

We begin with our standard of review and the legal principles involving a motion to acquit. "We review the sufficiency of the evidence to support a jury's verdict and the denial of [a] motion for judgment of acquittal de novo." *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). In conducting an inquiry into a district court's denial of a motion to acquit, "we ask whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Serrata*, 425 F.3d 886, 895 (10th Cir. 2005). In conducting this inquiry, "we do not weigh conflicting evidence nor consider the credibility of witnesses," which is left to the jury, but "simply determine whether the evidence, if believed, would establish each element of the crime." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (internal quotation marks omitted). "Under this standard, we will not reverse a conviction ... unless no rational trier of fact could have reached the disputed verdict." *Serrata*, 425 F.3d at 895. "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Id.* "Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* Because Mr. Smith failed to present any evidence at trial, our review involves only the evidence presented by the government during its case-in-chief.

-18-

## A. Mortgage Loans

Applying the applicable standard of review and legal principles, it is clear from the evidence admitted at the trial a reasonable jury could find Mr. Smith guilty beyond a reasonable doubt of the mortgage loan fraud committed, and, therefore, the government's evidence supported the district court's denial of Mr. Smith's motion to acquit. First, as conceded by Mr. Smith on appeal, the government's evidence established the fictitious identity of Austin Ikeme was explicitly intertwined with and used by Mr. Smith, as shown by witness testimony that he admitted he: (1) interchangeably used his and the Ikeme identities as his own; (2) used the Ikeme identity when questioned about the first failed closing and when he attempted to use that identity to set up another checking account in December 2007; (3) purchased fictitious Colorado and California driver's licenses in the name of Austin Ikeme; and (4) used both his name and that of Austin Ikeme on paperwork intended for a name change. In addition, as discussed hereafter, at trial three individuals were able to positively identify Mr. Smith as the person using the Ikeme identity.

The fact other witnesses did not personally meet the person representing himself as Mr. Ikeme, receive the loan application documents from him in person, or identify him in court as Mr. Smith and the source of the fraudulent documents, does not negate his guilt or otherwise fail to establish he did not commit the fraud

-19-

perpetrated. Instead, the direct and circumstantial evidence presented, together with the reasonable inferences to be drawn therefrom, were sufficient to establish beyond a reasonable doubt Mr. Smith perpetrated the mortgage loan fraud committed. This is because, in addition to the evidence establishing Mr. Smith used the Ikeme identity during the time in question, the government's evidence established that in November 2007 someone presenting himself as Austin Ikeme opened a checking account at Bank of the West and was also added to Mr. Smith's Bank of the West checking account for Marrick Entertainment. Around the same time, a person acting as Mr. Ikeme attempted to obtain loans for the purchase of the Vistancia Court property, using funds from the personal checking account of Austin Ikeme for the buyer's costs and providing a fake Colorado driver's license at the closing, which Mr. Smith later admitted to an investigator he purchased when questioned about its use at the closing. The same investigator positively identified Mr. Smith at trial as the person making this admission. This evidence alone is sufficient to tie Mr. Smith to the actions taken by the fictitious Mr. Ikeme in defrauding Wells Fargo.

In addition, a person identifying himself as Mr. Ikeme also told Mr. Bliesmer, who helped to facilitate the mortgage loans, that his previous name had been Alton Smith, when Mr. Bliesmer called and questioned him about the same fake driver's license presented at the first closing. At the next closing on the

property, funds from Mr. Smith's wife's account were used for the purpose of covering Mr. Ikeme's closing costs, and those funds were deposited into Mrs. Smith's account by the same California entity, K & K, which had deposited those funds into Mr. Ikeme's personal checking account prior to the failed closing. Again, these actions show a direct connection between Mr. Ikeme and Mr. Smith for the purpose of showing Mr. Smith committed the fraudulent scheme perpetrated on Wells Fargo.

The documents supporting both mortgage loans also included the fake California driver's license Mr. Smith admitted purchasing as well as the fake Social Security number used throughout the fraudulent schemes perpetrated and which Mr. Smith also admitted using. Furthermore, the income documents submitted for Mr. Ikeme identified Marrick Entertainment as his employer, which was the company Mr. Smith incorporated and which listed Austin Ikeme as holding corporate officer positions. No evidence established anyone but Mr. Smith used the name Austin Ikeme in association with himself or Marrick Entertainment, and the same Marrick Entertainment income information used for the mortgage loans was later used in the purchase of an automobile by Mr. Smith, where he was positively identified by a witness as the person providing that information.

Despite Mr. Smith's contentions he was not the person who purchased or provided the documents for purchase of the Vistancia Court residence, a witness testified he delivered three leased vehicles to Mr. Smith at that residence. He also identified Mr. Smith in court as the person he met with and knew both as "Alton" and Austin Ikeme. In addition, someone attempted to set up a personal checking account at Bank of the West in the name of Austin Ikeme using the Vistancia Court address. When a detective called the telephone number given for that person and address and later met with him in person, it was Mr. Smith he met with and who admitted he was Alton Smith but used the name Austin Ikeme. As previously mentioned, when another detective attempted to contact Mr. Smith, she also used that telephone number and talked with someone who acknowledged he was Alton Smith, but used the name Austin Ikeme, and who knew about the previous police station meeting and admitted to purchasing the California license. In addition, Mr. Smith admitted to a Wells Fargo employee his home had been foreclosed on due to dealings with an unscrupulous builder, which, assumably, was Mr. Serrano, who also deposited funds into a checking account which was eventually shown to be associated with Mr. Smith.

Altogether, the direct and circumstantial evidence presented by the government overwhelmingly showed a connection between Mr. Smith and the fictitious person Mr. Ikeme, the Vistancia property, and the fraudulent loan

documents delivered to Wells Fargo on which it relied concerning the purchase of that property. Based on this evidence and the reasonable inferences drawn therefrom, a jury could readily find Mr. Smith guilty beyond a reasonable doubt of perpetrating the fraudulent acts committed. Moreover, the district court clearly found the government's witnesses and other evidence credible when it denied the motion to acquit, as did the jury when it convicted Mr. Smith of the mortgage loan fraud counts. Accordingly, we conclude the government's evidence supported the district court's denial of Mr. Smith's motion for acquittal.

### B. Personal Line of Credit Loan

Based on much of the same or similar direct and circumstantial evidence, a jury could also find Mr. Smith guilty beyond a reasonable doubt of perpetrating the fraud committed concerning the personal line of credit loan from Wells Fargo. First, in submitting an application for the loan, the person representing himself as Austin Ikeme used the same false information used in the two mortgage applications, including the same fake name, date of birth, and Social Security number, as well as the same or similar false information about his employment and monthly income from Marrick Entertainment. Much of the documentation and information used for the personal line of credit was also used by Mr. Smith to obtain the loan for his automobile using the identity of Mr. Ikeme. In addition, the personal line of credit taken out by Mr. Ikeme also listed Mr. Smith as the

other borrower on the loan. Once the loan was approved, someone withdrew $10,000 from the personal line of credit and deposited it into the Marrick Entertainment business checking account on which both Mr. Smith and the fictitious Austin Ikeme were signatories. Later, other withdrawals on the line of credit were made and moved into the same Marrick Entertainment account associated with both Mr. Smith and the fictitious Mr. Ikeme. Obviously, Mr. Smith knew about these deposits, given he was the only actual person who held that account and was involved with Marrick Entertainment. Moreover, during one of the transactions, where $3,000 was withdrawn from Mr. Ikeme's line of credit and placed in the Marrick Entertainment account, a surveillance photo showed Mr. Smith making the withdrawal. Based on the evidence presented and the reasonable inferences drawn therefrom, a jury could readily find Mr. Smith guilty without a reasonable doubt of perpetrating the fraud committed concerning the personal line of credit loan. As a result, the government provided sufficient evidence to support the district court's denial of Mr. Smith's motion for acquittal on the personal line of credit count.

## C. Automobile Loan Sentencing

As to the automobile loan, Mr. Smith's counsel concedes on appeal that the government provided sufficient evidence to show Mr. Smith was the individual who perpetrated that fraud but requests, without any argument in support thereof,

resentencing on that count. We have long held "[a]rguments inadequately briefed in the opening brief are waived" on appeal. *Alder v. Wal-mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998). As a result, we decline to address Mr. Smith's sentencing issue on appeal.

### D. Pro Se Issue on Banking Institutions

In his pro se reply brief, Mr. Smith concedes the government's evidence established Wells Fargo and Security Service were "FDIC-insured" and "financial institutions" for the purpose of proving the elements of fraud against him. However, he argues the government failed to submit evidence also establishing Colorado Mortgage Alliance, which facilitated the mortgage loans, and Centennial Leasing and Sales, which facilitated the automobile loan, are also "FDIC-insured" or "financial institutions" for the purpose of convicting him on either the mortgage or automobile loans. In support, he claims "[t]he mortgage lender and car broker were ... wholly-owned subsidiaries of the two banks, [and] the subsidiaries were not "(financial institutions)["] within the meaning of the bank fraud statues [sic]."

Even if we consider this argument, which was also not presented in Mr. Smith's opening brief, we would deem his contention frivolous. This is because the indictment against Mr. Smith alleged he attempted to execute or executed a

scheme to defraud Wells Fargo Bank, "a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation," and "Security Service Federal Credit Union, ... a financial institution whose deposits were insured by the National Credit Union Share Insurance Fund." The record on appeal shows Wells Fargo is, in fact, the financial entity from which Mr. Smith ultimately obtained the mortgage loans, and Security Service is the financial entity which ultimately provided the automobile loan to him based on his same or similar fraudulent representations. It also shows Mr. Smith defaulted on their loans, making them the victims of his fraudulent schemes. As Mr. Smith concedes, the government provided evidence establishing Wells Fargo and Security Service were "FDIC-insured" and "financial institutions" for the purpose of proving the elements of fraud against him.

While Colorado Mortgage Alliance and Centennial Leasing and Sales may have initially furnished Mr. Smith the application forms and otherwise facilitated his loans, neither Colorado Mortgage Alliance nor Centennial Leasing and Sales ultimately loaned him the money from which a loss occurred due to Mr. Smith's fraudulent conduct. Therefore, the government was not required to provide evidence showing Colorado Mortgage Alliance and Centennial Leasing and Sales were "FDIC-insured" or "financial institutions." Accordingly, even if considered on appeal, Mr. Smith's pro se argument is frivolous.

-26-

## IV. Conclusion

For these reasons, we **AFFIRM** Mr. Smith's convictions.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge